(70 Misc. Rep. 52.)

TOWN OF HEMPSTEAD v. LAWRENCE et al.

(Supreme Court, Special Term, Nassau County. December, 1910.)

1. NAVIGABLE WATERS (§ 44*)—OWNERSHIP OF ALLUVIUM.

The fundamental idea of alluvium is an addition of particles which cannot be claimed by any one and in the absence of other claim is annexed to the upland to which it becomes attached, though, if title subsists in the land beneath, the deposit thereon necessarily becomes a part of the subsurface ownership.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–282; Dec. Dig. § 44.*]

2. NAVIGABLE WATERS (§ 36*)—TITLE TO SUBMERGED LAND.

Title to land submerged by the sea remains in the riparian owner.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

3. QUIETING TITLE (§ 44*)—BURDEN OF PROOF—ACCRETION.

In an action to determine title to land claimed as accretion, the burden of establishing the elements of accretion is on plaintiff.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. §§ 89–92; Dec. Dig. § 44.*]

4. NAVIGABLE WATERS (§ 44*)—"ACCRETION."

"Accretion" is a doctrine to facilitate and authorize the right of front access to the sea by a riparian owner who would otherwise be cut off from his shore, and is not a right of one riparian owner to extend his land sideways beyond his boundaries.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–282; Dec. Dig. § 44.*

For other definitions, see Words and Phrases, vol. 1, pp. 99, 100.]

5. NAVIGABLE WATERS (§ 44*)—REAPPEARANCE OF INUNDATED LAND—OWNERSHIP.

Where the lands of two owners face the ocean, there being a beach in front behind which is a narrow lagoon separating it from the mainland,

----

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and the ocean during a storm broke through the beach forming a shallow inlet into the lagoon on the land of the westerly owner, and subsequently the inlet because of tides and storms moved westward at the rate of over 500 feet a year, crossing the line between the two owners' lands, and the beach extended seaward by accretion, new land being added between the former shore line and the sea, the shifting of the inlet did not divest the title of the westerly owner, who could enforce his title as to parts of the original beach reappearing on the other side of the inlet, and the lands of the easterly owner did not grow by accretion to the west of the original line between his land and that of the westerly owner, nor did he acquire any right to the land formed by accretion in front of the land of the westerly owner by deposit between the former shore line of the westerly owner and the sea during the westerly movement of the inlet.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–282; Dec. Dig. § 44.*]

Action by the Town of Hempstead against Newbold T. Lawrence, individually and as trustee, and others. Complaint dismissed.

Fred Ingraham (Charles F. Brown and E. E. Sprague, of counsel), for plaintiff.

J. Henry Work (Wm. M. K. Olcott, of counsel), for defendants Lawrence, Herrick, Walsh, and Murray.

Foley & Powell, for defendant Richard Sandiford.

Frederick L. Gilbert, for defendant Jane Sandiford.

Charles L. Vandewater, for defendant Carman Frost.

Eph. A. Karelsen (George Boochever, of counsel), for defendants Hicks Beach Co., Wm. Scheer, Augustus Scheer, and James A. Goewey.

James D. Dillingham, for defendant Melvin Stevens.

PUTNAM, J. Plaintiff brings this suit to determine the title to the portion of the outer beach lying west of the estates of Long Beach, about 1,760 feet wide at the eastern extremity and extending about 3½ miles to what is known as East Rockaway (or Debs') Inlet. This stretch of beach is claimed in fee by plaintiff as part of its common lands.

The chief issue is as to the effect of a change in the beach which followed a breaking through and the formation of a channel or inlet extending from Hempstead Bay to the ocean, called East Rockaway or Debs' Inlet, which happened in April, 1870. Before that date there was no inlet or channel at this place. The beach of 40 years ago was a continuous sandy stretch, rather narrow in outline, which extended along the ocean front from Long Beach to a point to the westward of the lands here in controversy. Behind this beach was the broad, shallow estuary, known as Broad Channel, extending westward in a narrow lagoon forming a channel for boats. During this storm of April, 1870, with easterly winds and high tide, the breakers came over the outer beach, washing across to the inside. When this tide ebbed, the accumulated waters, forced back by the high winds, formed a shallow inlet extending out to the ocean that at first was about 100 feet wide and only a foot deep. It, however, soon widened, washing away

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

a house on a sand dune near by, and gradually deepened, forming a five-foot tidal channel for small craft which come out by steering about a south course from the middle of Broad Channel, or a southeasterly course from the point of Hicks Beach.

The outer beach, being composed of sand, was easily cut by tidal currents, so that this small inlet did not remain stationary. Fishermen and other boatmen who used this inlet soon came to notice that the course out to sea was no longer south, but changing to about south-southwest; and this set of the currents appeared to cut away the westerly side of the inlet and to deposit sand on its easterly side, so that this inlet gradually moved to the westward. In 1879, nine years after this inlet had pierced the beach, it was thought to have gone to the westward by estimates varying from 500 feet to half a mile. As, however, the inlet was used only by small craft and the channel was not surveyed, the exact rate that it had shifted to the westward was not observed. While moving to the westward, it washed away the beach on that side, while a corresponding new beach was made up to the eastward. Sometimes this inlet showed an expanse of water from 300 to 500 feet in width, but shallow, with a middle passage for moderate sized oyster boats. Later, marks were set to buoy the channel; but the changes were so frequent that the buoys could not be depended upon. In 1884 the inlet was going westward, but still was so shallow as only to be navigable at high tide. At low tide the inlet had less than 3 feet. After 1884 the lateral movement of the inlet was more rapid than before. A little later, the Lighthouse Board buoyed the channel, but these buoys had to be shifted after a severe storm. Indeed, after some of the spring storms the buoy at the ocean entrance to the inlet near the outer bar had to be moved westward as much as a quarter of a mile. Although the wearing away of the beach to the westward became more rapid, the channel depth did not increase, being at high water about 6 or 7 feet, with only from 1½ to 3 feet at low water.

In the last 25 years the progress of the inlet has been more rapid, which movement appeared to have further increased in the last 10 years. The bell buoy, which indicates the seaward opening into the inlet, was shifted last April from the position in which it had remained a year for a distance of a quarter of a mile or more to the westward. While precise measurements are not furnished, the testimony indicates that, in the 30 years since 1880, the average progress of the inlet to the westward has been over 400 feet a year. Between 1870 and 1880 its westerly advance must have been much less.

The contour of the beach thus cut away and submerged was more irregular on the inside. Upon the ocean front it had a rather uniform shore line; the general trend of the old shore being a little north of west. As to the contour and position of the newly formed beach which came along the east side of this shifting inlet, the testimony is very conflicting. An inference is drawn from the land at Long Beach to the eastward of the territory here in controversy. Visible monuments at Long Beach prove that the shore in 1910 extends as much as 400 feet farther south than was that beach 25 years

ago. Hence it is suggested that like influences may be operative to the westward, and that this new shore following Debs' Inlet has extended somewhat more to the seaward than the previous beach, which it has supplanted. Direct testimony on this point by laymen and navigators is largely conjecture.. In an incomplete map filed in the Coast and Geodetic survey in 1860, the outer beach is shown much wider than as described in 1870, so that the southern shore opposite Hicks Beach extends nearly to latitude 40 degrees 35 minutes. The chart of 1879 shows the outer beach much reduced, Debs' Inlet considerably wider than as testified to by the local witnesses, and the most southerly part of Shelter Island (as the remnant of the old beach was then called) to the north of the south line of 1860 by about 800 feet. Upon this 1879 chart have been imposed later surveys of 1909 and 1910 delimiting the new beach. All overlap some part of the old Shelter Island of the 1879 chart. At the more important point, where this formation of the new beach started from near the boundary of plaintiff's lands, the overlapping appears to have been over 1,000 feet in north and south width. The difference between the surveys of 1909 and 1910 shows a growth to seaward of over 200 feet in the last year.

The argument that the new beach is substantially without the limits of the old beach is therefore inconclusive for the following reasons: It cannot now be told how much of the shrinkage of the outer beach as shown by comparison of the charts of 1860 and 1879 had occurred before April, 1870, and whether or not the influence of the new inlet itself hastened the erosion of the south shore before 1879 is only a matter of conjecture. Again, it cannot be said how much of the present projection of the new beach represents its original formation as it followed the inlet, and how much is the result of a later growth. A substantial overlapping existed evidently at the point when the formation was near the plaintiff's boundary, and such overlapping would seem to cut off and forbid further westward extension of any claim to accretion.

The prior adjudication of Lawrence v. Town of Hempstead (final judgment on remittitur entered March 18, 1898) established title in this beach between Wells' line and this inlet, there described as Hog Island, or East Rockaway Inlet, formerly known as Brockel Face Gut. This includes the major portion of the beach here in controversy, although open to question as to precisely where the high-water shore or surf line then described was situated. Hence it seems established that in 1878 the town of Hempstead owned the beach to the eastward of this inlet as then located, and that the defendant Lawrence owned the beach to the westward thereof. In reply to the plea of this prior adjudication, the plaintiff averred that:

"In or about the year 1870 an inlet known as East Rockaway Inlet broke through the beach between Hempstead Bay and the Atlantic Ocean, at a point where the said beach was a part of the common lands of the plaintiff, the title to which was vested in this plaintiff in fee. And that, thereafter, the said inlet gradually working to the westward swept away and destroyed all of the lands which were the subject of the said Lawrence-Town of Hempstead litigation. And that the premises described in the complaint herein were thereafter formed by gradual accretion to the aforesaid common lands of the

plaintiff, and are located within boundary lines wholly distinct and different from the lands which were the subject of said Lawrence-Town of Hempstead litigation; and that while the lands, title to which is involved in this action, are in the same immediate locality as were the lands described in the Lawrence v. Town of Hempstead action above referred to, the south boundary line of the lands in this action is entirely south of what was the south boundary line of the lands referred to in said Lawrence-Town of Hempstead suit."

Plaintiff therefore raises three points: (1) The effect of the western shifting of the inlet submerging the former beach; (2) the formation of the new beach following this inlet; and (3) the relative lines of the ocean front or shores of the old and new beaches.

1. Although after a few months from its formation in April, 1870, this inlet was navigable for oyster vessels, it appears to have always been shallow, so that its depth at low tide did not exceed two or three feet. The beach being wholly of sand was readily eroded by the western set of the ebb currents, so that the sandy slopes and occasional dunes were undermined, swept away, and carried out to sea; the sand thus dissolved being afterward deposited on bars, shoals, and the shores to the eastward. The question arises as to the legal ownership of land thus encroached upon and swept over by a shifting, shallow channel which at the time is navigable for small vessels. The uniform depth at which this erosion operated seems to indicate only a surface submersion, not such a complete and destructive washing away of the land as has been witnessed in such points as about the Island of Helgoland in the North Sea, or about Sable Island in the North Atlantic, where past experience shows the land is carried away to a considerable depth, and may thus be considered as irrecoverably lost. Not only was this beach only superficially submerged, but the area so covered was apparently limited to the dimensions of this moving inlet. While a heavy storm might widen it somewhat, the reflux of the tides seemed steadily to replace on the east bank what had been taken away from the opposite beach, generally not over 500 feet away. Speaking of such effects of a grave inundation upon the ownership of submerged lands, Grotius said, in 1625:

"For mostly, though the surface part of the ground is dissolved into sand, the lower solid part of the soil remains, and though it may in some measure change the quality, it does not change the substance (in arenam dissolvatur, manet tamen solida pars fundi inferior; et ut de qualitate aliquid mutet, substantiam non mutat) any more than a part of the land upon which a lake is drained, the right to which is not thereby changed, as the Romans rightly decide." War and Peace, Book 2, c. 8, par. 10 (Whewell Ed.) vol. 1, p. 404.

About 50 years later, Sir Matthew Hale, in his De Jure Maris, asserted the principle even more strongly to the effect that, if the land swallowed up by the sea could be known and identified from the firm land, the subject doth not lose his property though the inundation continue for 40 years. Hargrave's Law Tracts, p. 15. So it is concisely stated in Comyn's Digest:

"If the sea overflows the land of any person, and after 40 years flows back again, the owner shall have the land, and not the King." Prærogative D, 61.

That title to the submerged lands remains in the riparian owner is distinctly held in this state in Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. St. Rep. 206; Id., 29 Hun, 660.

These authorities abundantly establish that the movement of this inlet did not divest the title of the defendants in the submerged beach, and that such title would be enforceable as to the parts of such original beach as should reappear above the sea's surface. The overflow of the original beach did no more than to remove the top layer of sand—a process of shifting the soil to the opposite side of the narrow and varying inlet. Even if the entire beach had been thus submerged at once, instead of only diagonal sections of the beach at a time, the defendants' realty would not be eradicated and their title gone. In the facts in the case at bar, the beach was never submerged so that one could not have forded the inlet at low water; and, if that depth was only one or two feet (as Capt. Ruland of the Lighthouse Board testified) in periods of strong westerly winds with low tides, the submergence of even the bed of this inlet would have been inconsiderable.

2. The formation of the beach easterly of this inlet: Assuming that the first breaking through of the inlet in April, 1870, was upon plaintiff's common lands, it produced no change of title, as plaintiff still owned both banks, and no land was permanently taken without its boundaries. When, however, the westerly progress reached the defendants' lands, it is claimed a different situation arose. However, the burden of establishing the elements of accretion is on the plaintiff. Matter of Smith, 137 App. Div. 652, 122 N. Y. Supp. 281. If the shifting inlet and the effacement and submergence of the old beach did not divest defendants' ownership below the surface, how could the imperceptible gain by lateral accretion be permitted to overlay defendants' submerged lands? The fundamental idea of alluvium is an addition of particles which cannot be claimed by any one (De alluvione, hoc est, de adjectione particularum quæ a nullo vindicari possunt. Grotius, Book 2, c. 8, par. 11), and, in the absence of other claim, is annexed to the upland to which it becomes attached. If, however, title subsists in the land beneath, the deposit thereon necessarily becomes part of the subsurface ownership. "Accretion" is therefore a doctrine to facilitate and authorize the right of front access to the sea by a riparian owner who would otherwise be cut off from his shore; it is not a right of one riparian owner to extend his land sideways beyond his boundaries. Mulry v. Norton, 100 N. Y. 424, 436, 437, 3 N. E. 581, 53 Am. St. Rep. 206; St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941; Widdicombe v. Rosemiller (C. C.) 118 Fed. 295.

There is a further difficulty in the plaintiff's claim, in that the growth westerly of the beach was not gradual and imperceptible, but rapid and by obvious steps coincident with every storm. One of the plaintiff's engineers testified that a red buoy placed in this inlet in 1908 was imbedded in the sand approximately 1,000 feet east of the inlet by January, 1910; and another witness declared that a buoy placed in this inlet in 1906 is now half a mile distant. Indeed, Mr. Ritter, plaintiff's engineer, said the inlet was changing faster than he could survey it. An advance of upwards of 500 feet per year, and that per saltum in occasional storms, would not be that gradual and imperceptible accretion to which this doctrine is restricted.

It therefore follows that the growth of the beach to the east of the inlet did not form an addition to the plaintiff's common lands, as has been here contended.

3. It is further urged that the high-water mark of the ocean mentioned in the conveyance from the referee in 1879 is farther north than the present surf line of the newly formed beach. Even if such fact were definitely established, it is not seen how it would give plaintiff title to such southern littoral. The right of accretion not extending across the boundary of a lateral owner could not leap over and claim the outer shore margin, even if the new beach projected southerly beyond the surf line of the prior beach.

Although the deed to Alfred N. Lawrence by C. Livingston Vandewater, referee, on May 6, 1878, described this beach as bounded on the southerly side by the Atlantic Ocean, that beach or surf line could not be permanent, but was subject to the wearing away at times and places and the possible extension outward into the sea accordingly as the line of the flow of the tide advanced or receded. To take the shore line as a boundary of title, forever fixed by the chart of that date, would ignore these changes of the line impressed by high water—changes and variations to which such shores are necessarily subject.

These conclusions are not in conflict with Van Deventer v. Lott, 180 Fed. 378, 103 C. C. A. 524, as it was there found that the gradual extension of Rockaway Beach was half a mile outside of the former territory of Barren Island, and that the portion of Barren Island carried away was transported beyond the owner's boundary; at least, that it had never been returned by accretion or reliction. In the case at bar, the return of the land has gone on simultaneously with the erosion; the result being merely a transfer from one part to another part of the beach within defendants' land boundaries. This inlet and its westerly progression are not solitary and exceptional phenomena. They are very like what happened 30 years before, as detailed in Mulry v. Norton. Along such an exposed sandy shore as extends eastward from Rockaway, an outer bar or shoal, forming a narrow beach, is subject to change from occasional violence of the sea; but these destructive forces tend also to deposit the material along similar bars and shoals and to create new beaches instead. Where the two processes of washing away and redeposit follow in such a close sequence as the facts here show, it would be a harsh rule that would treat the first title as lost and give another the right to this second beach formed from the sand of the first and extending in part along its very bed.

It follows that plaintiff has not made out title to the lands in question, and the complaint is therefore dismissed, with costs.

Complaint dismissed.