TOWN OF HEMPSTEAD v. LAWRENCE et al.

(Supreme Court, Appellate Division, Second Department. December 15, 1911.)

NAVIGABLE WATERS (§ 44*)—ACCRETION—TITLE TO PROPERTY.

 A town owned a sand beach along the southerly line of the town separated from the mainland by a channel connecting two larger bodies of water, and bounded southerly by the ocean. In 1870 a channel broke through the beach wholly on the land of the town. The channel became navigable, and gradually the position of its banks shifted by erosion on the westerly bank and by accretion on the easterly bank, and finally the land of an adjacent owner on the westerly side was imperceptibly carried away by erosion, and by a process equally gradual land was formed by accretion on the easterly side. *Held*, that the town acquired title to the land formed by accretion.

 [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–278; Dec. Dig. § 44.*]

 Hirschberg, J., dissenting.

Appeal from Special Term, Nassau County.

Action by the Town of Hempstead against Newbold T. Lawrence, individually and as executor, and others. From a judgment dismissing the complaint upon the merits (70 Misc. Rep. 52, 127 N. Y. Supp. 949), plaintiff appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, WOODWARD, and RICH, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Charles F. Brown (Edward E. Sprague and Fred Ingraham, on the brief), for appellant.

W. M. K. Olcott, George Boochever, and Eph. A. Karelsen, for respondents.

WOODWARD, J. The plaintiff brings this action to establish its title to a strip of beach land along the shore of the Atlantic Ocean; and being the extreme southerly portion of the township. This property is a strip of sandy outer beach about 3½ miles in length, and about 1,760 feet wide at its easterly extremity, and of substantial width throughout its entire length. This parcel of land is separated from the mainland, known as "Hicks Beach," by a shallow channel, and is bounded on the south by the Atlantic Ocean. Eastward of Hicks Beach is a body of water forming a portion of Hempstead Bay, known as "Broad Channel." The premises in dispute are within the lateral boundaries of the lands, meadows, marshes, waters, and beaches which were granted to the freeholders and inhabitants of the town of Hempstead by royal patent, executed by Thomas Dongan, Lieutenant Governor of New York, and dated April 17, 1685. Prior to the year 1870, a strip of sandy beach extended along the southerly line of the town of Hempstead, bounded southerly by the Atlantic Ocean, from a point easterly of the premises described in the complaint to a point westerly thereof. In the month of April, 1870, a new inlet, then known as Deb's Inlet and subsequently known as Hog Island or East Rockaway Inlet, broke through from Hempstead Bay to the Atlantic Ocean at a point to the east of the easterly line of the premises described in the complaint. This inlet, at first very shallow, soon reached a considerable depth, and became navigable both in fact and in law, being used for ingress and egress from the cove which separated the beach from the mainland. This inlet, in effect a river in which the tide ebbed and flowed between the Atlantic Ocean and the cove, did not remain fixed, but gradually moved to the westward at an average rate, as appears from the testimony, of about 400 feet each year. This inlet or river appears to have been practically a half mile wide, with a channel ranging in depth from 3 to 7 feet at varying tides, and about 500 feet wide, so that the inlet or river, in its progress to the west, cut a channel of several feet in depth across this outer beach and opened it to navigation. With this movement of the channel to the west there came a gradual accretion to the easterly shore, and the evidence indicates clearly that this accretion, following the westerly drifting of the channel, formed a considerable distance to the south or ocean side of the former location of the outer beach, though overlapping the same to some extent, and the plaintiff claims that this accretion belongs to the town of Hempstead as the owner of the lands to which the changing sands of the inlet attached, even though the location covers some of the area originally covered by the defendant's land. The learned court at Special Term has dismissed the complaint upon the merits, and the plaintiff appeals to this court.

In the process of time there was a moment when the plaintiff

owned the eastern bank of the inlet or river, while the defendant or his predecessor in title owned the western bank of the inlet or river, and the evidence in this case shows that this inlet or river has gradually, and with imperceptible movement, proceeded to the westward, while a corresponding shore line has emerged to the eastward, the channel of half a mile in width, 500 feet of it being open to practical navigation for small craft, intervening at all times. Angell on Water Courses (section 57) quotes Blackstone, to the effect that if a river, by degrees, gains upon the land of a person on one side, and thereby leaves the other dry, the owner who loses his ground thus imperceptibly has no remedy. The same author continues:

"A river ran between two lordships, and the soil of one side, together with the river, entirely belonged to one of the lordships; and the river, by very slow degrees, did encroach upon the soil of the opposite lordship; but so very deliberately, that it was impossible to perceive an immediate alteration; therefore, by this imperceptible increase, the land relicted became the property of the first lord. But if the river, by a sudden and unusual flood, had gained hastily a great parcel of the other lord's ground, he should still be entitled to the same."

In the case at bar an inlet or river is formed upon the land of the town of Hempstead. It is a natural waterway in which the tide ebbs and flows, and by imperceptible erosions on the one side and accretions on the other the land of the defendant to the westward is shifted and made to attach itself to the lands of the town of Hempstead on the east, and, if the land of one lordship could be transferred to the other by this same process, we see no reason why the same result should not follow here. It is true, of course, in the case at bar that the evidence does not show an imperceptible change, in the sense that the change could not be discovered at short intervals of time, but there is no evidence in the case which tends to show that any one could discover changes at the time they were being made, or that they could discover them at periods of a few days. The evidence is practically undisputed that intervals of weeks and months were necessary to show the changes, and that the movement has been at the rate of about 400 feet per year. In the leading case of The King v. Lord Yarborough, 3 B. & C. 91, which dealt with a tidewater case, two passages were cited from Hale's De Jure Maris in behalf of the crown, where the writer speaks of land gained by alluvion as belonging generally to the crown, unless the gain be so insensible that it cannot by any means, according to the words of one of the passages, or by any limits or marks, according to the words of the other passage, be found that the sea was there. This led to a discussion of the meaning of the word "imperceptible"; and the court, speaking by Abbott, C. J., say:

"In these passages, however, Sir Matthew Hale is speaking of the legal consequence of such an accretion, and does not explain what ought to be considered as accretion insensible or imperceptible in itself, but considers that as being insensible, of which it cannot be said with certainty that the sea ever was there. An accretion extremely minute, so minute as to be imperceptible even by known antecedent marks or limits at the end of four or five years, may become, by gradual increase, perceptible by such marks or limits at the end of a century, or even of 40 or 50 years; for it is to be re-

membered that if the limit on one side be land, or something growing or placed thereon, as a tree, a house,. or a bank, the limit on the other side will be the sea, which rises to a height varying almost at every tide, and of which the variations do not depend merely upon the ordinary course of nature at fixed and ascertained periods, but in part also upon the strength and direction of the wind, which are different almost from day to day. And therefore these passages from the work of. Sir Matthew Hale are not properly applicable to this question. And considering the word 'imperceptible' in this issue, as connected with the words 'slow and gradual,' we think it must be understood as expressive only of the manner of the accretion, as the other words undoubtedly are, and as meaning imperceptible in its progress, not imperceptible after a long lapse of time."

So Angell on Tidewaters (1st Ed.) § 71, lays down the rule that:

"The test of what is gradual as distinguished from what is sudden seems to be that, though witnesses are able to perceive from time to time that the land has encroached on the sea line, it is enough if it was done so that they could not perceive the progress at the time it was made."

See Mulry v. Norton, 100 N. Y. 432, 3 N. E. 581, 53 Am. Rep. 206, and authorities there cited. The original opening of this inlet or river was sudden. It occurred in a single storm on a given day.. The change in the location of the inlet has never, since that time, been sudden in any such sense, in so far as the record goes. In a sense it might be said that a change of 400 feet in a shore line in a year would be sudden. It would be sudden in the case of a fixed shore line of the mainland, but it is hardly remarkable in the case of a mere sandhill thrown up by the changing tides of the ocean, and no witness pretends that he ever saw the change going on, or that he ever witnessed any considerable change due to a storm or other disturbance. Some of the witnesses testify that they have observed changes from month to month, but none of them claim to have observed changes at less periods, and the case is barren of any evidence that any one could see the change going on at any given moment, or that they were able to see any change from one day to another, and, considering the nature of the soil and the circumstances disclosed by the evidence, we are of the opinion that the change must be deemed to have been slow and gradual, as distinguished from a sudden change wrought by storms or other violent action of the elements, such as was evidenced by the original breaking through of the inlet.

This is not the case of an inundation or submerging of an island which subsequently reappears by reason of a recession of the waters. It is an actual cutting away of the soil which originally belonged to the defendants' property and carrying it away to the lands of the opposite proprietor, and depositing it in such a manner that it does not in the process of the change affix itself to the same location that it originally occupied, for the evidence is conclusive that for the most part the new beach is far south of the original beach. Under these circumstances, we think it was error for the learned court at Special Term to dismiss the complaint. Certainly the defendants are not entitled to the accretions which formed upon the lands of the plaintiff, and which are south of the lands which they originally owned.

The judgment appealed from should be reversed, and a new trial granted, costs to abide the final award of costs.

RICH, J., concurs.  BURR, J., concurs in separate memorandum.
HIRSCHBERG, J., dissents.  JENKS, P. J., not voting.

BURR, J.  I concur with Mr. Justice WOODWARD that this judgment ought to be reversed.

Prior to 1870 plaintiff was the owner of a strip of sandy beach, bounded upon the north by a shallow channel separating it from the mainland, known as "Hicks Beach," and connecting Far Rockaway Bay on the west with Hempstead Bay on the east.  Upon the east it was bounded by Broad Channel, which connected Hempstead Bay with the ocean, and on the west by land claimed by defendants or their predecessors in title.  In 1870, as the result of a violent storm, an inlet was formed which connected said channel with the ocean. This became and has continued to be up to the present time a navigable stream of somewhat varying width and depth.  The easterly and westerly boundaries of this river were originally entirely upon plaintiff's land.  If it be true that, as the result of this, plaintiff lost title to so much of its land as lay in the bed of this river, it lost it only to the state, and continued to be the riparian owner upon both the east and west sides thereof.  Gradually the position of the banks of this river shifted to the west, until there came a time when the bed of this stream was coincident with the line which had formerly bounded plaintiff's land upon the west and defendants' land upon the east.  If this stream had not thereafter shifted its banks, this controversy could not have arisen.  What had previously occurred might be interesting from a historical or scientific standpoint, but the legal rights of the parties would not be affected thereby.  Plaintiff would have been the owner of a plot of land, bounded on the south by the ocean and on the west by this navigable stream.  Defendants or their predecessors in title would have been the owners of a plot of land bounded on the south by the ocean and on the east by the same stream.  Each would have possessed the rights of riparian owners, both as to the ocean and the river.  But the shifting of the banks of this river did not then cease.  Very gradually the land of defendants to the west thereof disappeared by erosion.  I think that there is but one conclusion to be drawn from the evidence in this case, and that is that, while the change in the lines of the channel of this river was at times somewhat sudden, the change in the position and location of its westerly bank was so gradual that it could not be perceived and noted, except after the lapse of a considerable period of time.  If the easterly bank of this river had remained stationary while the westerly bank continued to shift toward the west, I think that it could not be successfully claimed that the resulting loss of land did not fall upon the defendants.  That is one of the hazards of riparian ownership of, a sandy beach.  The easterly boundary line of their land would have been the westerly bank of this navigable stream, notwithstanding the fact that this bank was some distance to the west of the line formerly dividing the lands of plaintiff and defendants. But by a process equally gradual with that of erosion on the west bank of the river accretion was going on upon the east bank thereof.

Nearly contemporaneous with the loss upon one side was the gain upon the other.

But is that any reason why the law of erosion of defendants' land and the loss consequent thereon should be suspended? Is the fact that coincident with their loss, and in some degree commensurate with it, plaintiff obtained a gain, sufficient to overturn the well-established law both of erosion and accretion? The result of defendants' contention, if allowed, would be that whereas plaintiff was at one time an owner with riparian rights upon both sides of this navigable river, and afterwards an owner with riparian rights upon the easterly bank thereof, it now loses all of such rights and defendants acquire both. If in 1870, when the inlet broke through from bay to ocean, the location of this inlet had been exactly upon the dividing line between plaintiff's and defendants' land, and subsequently thereto precisely the same gradual shifting of its banks had occurred which the evidence in this case discloses did occur, would any question then have arisen that defendants' easterly boundary line receded and was fixed by the westerly bank of said stream, or that plaintiff's westerly boundary line progressed and was fixed by the easterly bank thereof? I fail to see how the fact that the bed of the stream reached the original boundary line between the parties gradually instead of suddenly can produce any different result. When that point was reached, the rights of the parties became fixed with reference to that stream, and thereafter their respective rights were the same as if it had always existed there, or as if it had suddenly come into existence at precisely that point.

I think that the judgment appealed from should be reversed, both on the law and the facts, and a new trial granted, costs to abide the final award of costs.