George F. X. McInerney, J.
This very involved and exhaustively prosecuted and defended action arose out of the efforts of the defendant DeMarco to buy a plot of land in Shinnecock Bay from defendant Heilner and erect a motel on it.
The plaintiffs sought (1) a permanent injunction against the *320 defendants filling in land below the traditional high-water mark at the edge of the land which they alleged was theirs, or against trespassing upon it; (2) a declaratory judgment describing the boundaries of the plaintiffs’ lands abutting the shore line of defendant’s property; (3) a declaration of an existing easement in favor of the public over plaintiffs’ land, and (4) an injunction prohibiting further waste and damage to the described property.
The pleadings are voluminous, and complicated, and a scholastic’s delight. Every effort of the defendants to complete a motel on the property has been countered by the actions of the trustees.
The defendant DeMarco is a builder. He entered into a contract of sale of the premises with the owner, Heilner, on May 10, 1972. The property is about 5 acres and is on the eastern side of Tiana Bay, an arm of Shinnecock Bay. It was then zoned "M” (motel zone). At the time of the signing of the contract the parties were aware that the Town Board of Southampton was changing the zoning to one-acre residential as of May 22, 1972. The contract contained the following clause: "This sale is contingent upon purchaser commencing construction of a motel on the premises within two weeks of the date of this contract. If purchaser does not start construction within such time, down payment will be returned, and neither party shall have any further rights as against the other.”
DeMarco thus had 10 days within which to commence construction of the motel as far as his contractual rights were concerned and 12 days within which to establish a vested nonconforming use prior to the effective date of change of zone.
DeMarco, aware of the deadline, had already applied for and had been issued the approval of the Suffolk County Department of Health on his building plans showing the proposed construction of 108 living units in 24 separate structures. A building permit was subsequently issued by the town on May 11, 1972 and DeMarco started construction and had met the time period stated in the contract of sale, and by the 22d of May he had completed the foundations of three of the proposed structures.
Thus he had presumably overcome the obstacles of the new zoning classification, and his building permit was by ordinance valid as long as he had started construction of the buildings *321 and diligently prosecuted it within three months from the date of issuance.
Assiduous though DeMarco was, he had engaged a worthy opponent. By letter dated June 14, 1972 the building permit was conditionally revoked by the town building inspector because of need of the approval of certain modifications by the Suffolk County Department of Health. It was reinstated on 16 June. On 21 June an information was filed against DeMarco in the local Justice Court charging him with trespassing at the water’s edge upon public and private property, a violation of a local ordinance. This was dismissed by Justice Berkerey, Town Justice, on November 1, 1973, as was another one for the same charge filed on July 16, 1973. The dismissal was appealed by the Trustees to the Appellate Term which in its opinion dated March 22, 1974 affirmed the dismissal.
In addition, plaintiff sought an injunction preventing DeMarco (as Todem Homes) from continuing with the construction. A temporary injunction was denied and the complaint dismissed (July 13, 1972). This order was appealed and the Appellate Division reversed Special Term and remitted the matter for determination of whether the defendant had acquired a vested interest.
Upon the hearing the court found that a vested interest had been established and authorized the continued construction of 32 units. (Town of Southampton v Todem Homes, Sup Ct, Suffolk County, Dec 17,1974, Bracken, J.)
In the meantime, on June 23, 1972 DeMarco was served with the original summons and complaint in the instant action by order to show cause returnable June 26. A stay was issued. The complaint sought a temporary injunction as well as a permanent one prohibiting the defendants from filling in or trespassing on certain peripheral marine edges of the premises now alleged to be the property of the trustees. The court set a hearing on a motion (order June 28, 1972) and at the conclusion of the hearing the court denied the request for a temporary injunction, vacated the stay and gave a preference for immediate trial, (order, DeLuca, J., Sept 27, 1972).
Applications followed for leave to amend, etc., and the matter finally came to trial before this court on November 6, 1974, and was, with some pauses, completed in late January, 1975.
One fact first to be determined is whether Shinnecock Bay is or was navigable in law, for if it was navigable in law, *322 ownership of the upland would run to high-water mark (Tiffany v Town of Oyster Bay, 209 NY 1) and if it was nonnavigable in law, it ran at least to low-water mark as the defendants contend. (Fulton Light, Heat & Power Co. v State of New York, 200 NY 400; White v Knickerbocker Ice Co., 254 NY 152.)
The early English rule was that all waters which had a change of tide were navigable and all others were nonnavigable. (People ex rel. Howell v Jessup, 160 NY 249, 260.) In Morgan v King (35 NY 454) this rule is so stated, but the court is careful to point out that whether the king or private persons owned the land under tidal waters, the public had a right to use the waters for the purpose of transportation or passage paramount to the rights of the riparian owners, as well as where the waters were navigable in fact. It added that navigable in fact, generally speaking, was meant to connote streams on which boats, lighters, or rafts might be floated to market. This definition has been continually broadened, Roberts v Baumgarten (110 NY 380); White v Knickerbocker Ice Co. (supra), and a fairly recent case has stated: "However, in determining whether the creek was navigable in fact, the circumstance that the tide ebbed and flowed therein is not, under the modern and majority rule which prevails in this country and in this State, controlling. Under said rule, a waterway is navigable in fact only when it is used, or susceptible of being used, in its natural and ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water (The Daniel Ball, 11 U.S. 557, 563 Harrison v. Fite, 148 Fed. 781, 783; Van Cortlandt v. New York Cent. R. R. Co., 139 Misc. 892, revd. 238 App. Div. 132, revd. 265 N.Y. 249; 56 Am. Jur., Waters, §§ 178, 179, pp. 642, 645; cf. Navigation Law, § 2, subd. 5). Under the correct test of navigability, the paramount factor to be considered is not the actual use to which a stream has been put, or the purpose of its use that is important, but rather its capacity for use and its susceptibility for use (in its original state or condition) for trade, commerce or travel. The fact that a stream has been used for pleasure boating may be considered on the subject of the stream’s capacity and the use of which it is susceptible.” (Fairchild v Kraemer, 11 AD 2d 232, 235.)
Earlier surveys indicate that as recently as 1919 the high-water line was substantially seaward of the present one and *323 the defendants maintain that at least this should be the correct line of property ownership. (Actually they maintain that they own farther than that.) The argument is that the change in the water line was not due to erosion but to the intentional acts of the governmental agencies in opening up Shinnecock Bay to the effects of Peconic Bay and the Atlantic Ocean, and that since this event Shinnecock Bay has experienced tides, a situation previously unknown, and a resultant elevation of water level in Shinnecock Bay and submergence of upland.
Shinnecock Bay was a land-locked body of water of uncertain dimensions at some time in the obscured past, bounded on the south by the narrow barrier beach separating it from the waters of the Atlantic Ocean; on the west by a swampy wetlands through which a canal was dug giving access to the bays further to the west; on the north and east by land. There came times when the inhabitants tried to dig an inlet to the south to the ocean, and did prior to 1919 dig Shinnecock Canal through the narrow land barrier to the north to the tidal waters of Peconic Bay, a tributary of the Atlantic Ocean.
Long Island, mainly a glacial terminal moraine, extends into the ocean for about 120 miles and on its low south shore is a number of bays of varying sizes and depths, sometime separated from each other by wetlands but now cut through. The barrier beach is merely a sand bar protecting these bays from the direct assault of the ocean. It is impermanent and the unfortunate fact that many people have erected substantial homes on it does not stop the action of the indifferent sea. Every year the autumnal storms threaten its very existence and strident calls are made to have the various governmental agencies devise a method of stopping the ever-present erosion and avulsion.
The history of the barrier beach discloses that inlets were opened and closed by natural forces from time to time as they still are. Due to a constant westward drift of material from the east end of Long Island at Montauk Point the inlets generally move to the west. Major storms cause breaks through the sand barrier which usually are filled in by the normal drift. Some remain open for a substantial period, but unless they are stabilized by man’s efforts they are transient.
The fact of a submergence has been well established by the testimony. Stumps of trees were found well into the bay, some of hundreds of years of age and some of thousands. It was *324 stated by expert testimony that these trees could not have grown in salt water. Testimony also disclosed that the strata under the present water are all marine, and that there was no known source of salt in the area which could make the bay saline except the ocean. The opinion was expressed that the sea level had substantially increased over the years, inundating at least some ground which had been in the form of islands. The actual increase of the tide between 1898 and 1972 was about three and a half feet according to the testimony and was caused by two factors. One was the original opening and subsequent improving of the Shinnecock Canal to Peconic Bay. The other was the natural break in the barrier beach in 1938 and its attempted stabilization to date, necessitating breakwaters and the creating of sand deposits. The proportion contributed by each of these inlets is uncertain from the proof adduced.
Defendants argue that obviously the bay was not subject to tides in the past because it was landlocked and therefore the rules of nontidal waters should be applied, and that the rights of the owners having been vested, a man-made incursion of ocean water could not change these rights, and that in any event, the land now covered by water due to the construction of Shinnecock Canal, and its later improvement, together with the stabilization of a fortuitous storm-caused temporary break in the beach cannot deprive upland owners of title to land previously above water.
Unarguably, the bay varied in salinity through the years as the barrier beach opened and closed, and it must have been made saltier in recent years by the action of man. Some of the plant and animal forms found in the bay are capable of survival in either brackish or salt water.
Assuming the validity of defendants’ asserted facts, the argument seems persuasive.
It is futile to go back in time to "the beginning” to ascertain the original status of the bay for at one time there was no water on the earth at all and then later present mountains were thousands of feet below sea level, and in the future may be again. So it must suffice to say that in 1898 the determination was made that Shinnecock Bay was nontidal and treat the subsequent changes on an ad hoc basis.
In People ex rel. Howell v Jessup (160 NY 249, 260, supra), the court, pointing out that the common-law rule defined navigability in terms of tidality, affirmed the holding of the *325 lower court that the waters leading into Shinnecock Bay from the west had no ebb and flow, and that there was no continuous highway through the waters and various bays by natural channels east of the point which would include Shinnecock Bay.
The court also pointed out that the lower court had found that the waters were then navigable in fact at that point, but held that this had no bearing on the legal issues in the case because it felt that the status of the bay at the time of the granting of the early patents would also control its current status. Under the common law of tidality, it then resulted in a finding of nonnavigability in law because of nontidality. Finally, the court mentioned that there had been some modification of the rule in this country, citing Roberts v Baumgarten (110 NY 380, supra) already discussed.
The defendants argue that since the bay was determined to have been nontidal and thus nonnavigable in law when the patents were issued, the upland owner had title to low-water mark, the usual line of demarcation in nonnavigable waters where someone else owned the water bottom. (Gouverneur v National Ice Co., 134 NY 355.) The trustees in the present case have title to the bay bottom and the defendants make no claim to this property.
They then argue that if some of their land was submerged due to the action of the trustees in opening Shinnecock Canal or any inlet, title to the submerged land was not affected. This is true.
A case directly on point with the matter at bar as alleged by defendants, is Wheeler v Spinola (54 NY 377). A fresh water pond was connected to sea water without the upland owner’s consent, resulting in a rise and fall of tide.
The court stated (pp 384-385): "Those who owned the bed of the pond, as well as the riparian owners, must have had the same rights afterward as before. The owners of the bed of a fresh-water pond certainly cannot, by letting into it the water of the ocean, extend their right of ownership to the high-water mark of flood tide. The boundaries between them and the riparian owners must remain the same. The proprietors of land bordering upon streams and waters in which the tide ebbs and flows, own only to high-water mark, and the land below that belongs, in this country, to the people. But this rule of ownership cannot apply to this pond. It must be treated for all the purposes of this case as if it had remained a *326 fresh-water pond. Neither can the rule as to riparian ownership be applied to this pond which is applied to ordinary freshwater streams. A boundary upon it does not carry title to its center but only to low-water mark. Such is the rule as to boundaries upon natural ponds and lakes.”
Assuming then, that the defendants could establish the water boundary of their upland when Shinnecock Canal was opened, which they have not done, their rights would be unaffected by the conversion of either fresh or salt water of Shinnecock Bay into tidal Shinnecock Bay.
In Matter of City of New York (Realty Assoc.) (256 NY 217), the court states that a private owner is not divested of title by avulsion, and that the right to regain land rests on the principle that the title to it remains in the riparian owner.
The court goes further, and holds that title is not presumed to have been lost by abandonment even when the land has been submerged for more than 30 years, pointing out that when one acquires title by deed it will not be affected by nonuser.
If natural avulsion causing submergence does not cause a change in title, certainly submergences caused by man’s actions would not either.
The question as to whether the trustees would be held on damages for raising the water level without the consent of the owners, if this be so (Fulton Light, Heat & Power Co. v State of New York, 200 NY 400, supra) need not now be determined.
In any event, as mentioned, there was a substantial natural break in the barrier beach in 1938, creating an inlet still open today and whatever had been the status of the bay before this, it now became tidal and the changes are controlled by the rules outlined in Mulry v Norton (100 NY 424). It should be noted that the court talks of land which has been submerged as well as land washed away.
The court says at page 434:
"It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or enables another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner’s boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. Land lost by submergence may be regained by reliction, and its disap *327 pearance by erosion may be returned by accretion, upon which the ownership temporarily lost will be regained.
"When portions of the mainland have been gradually encroached upon by the ocean so that navigable channels have been extended thereover, the people, by virtue of their sovereignty over public highways, undoubtedly succeed to the control of such channels and the ownership of the land under them in case of its permanent acquisition by the sea. It is equally true, however, that when the water disappears from the land, either by its gradual retirement therefrom or the elevation of the land by avulsion or accretion, or even the exclusion of the water by artificial means, its proprietorship returns to the original riparian owners. (Angelí on Tide Waters, 76, 77; Houck on Rivers, § 258.) Neither does the lapse of time during which the submergence continues bar the right of such owner to enter upon the land reclaimed, and assert his proprietorship. (Angell on Tide Waters, 77-80, and cases cited.) It is said in Hargraves’ Law Tracts (Sir Matthew Hale’s De Jure Maris), 36, 37: 'If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or though the marks be defaced, yet if by situation and extent of quantity and bounding upon the firm land the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject does not lose his property, and accordingly it was held by Cooke and Foster, M. (7 Jac. C.B.), though the inundation continue forty years.’ ” (See, also, Matter of City of New York [Realty Assoc.], 256 NY 217, supra.)
When Shinnecock Bay became tidal the right of the public to use its surface for navigation and associated purposes did not change in any way. In Fulton Light, Heat & Power Co. v State of New York (200 NY 400, 412, supra) the court says: "The common law of England fixed, as an unalterable rule, the title to the bed of tidal streams in the sovereign and to the bed of fresh water streams in the owners of the adjacent banks, the owner of each side taking to the center, or usque ad ñlum aquae; but made no distinction against the public right of passage and transportation. The navigability, in fact, of the stream had no relevancy to the question of the title to its bed; it was relevant solely to the public right to pass, or to transport, upon it, as upon a highway. A stream, to be exclusively owned by the riparian owner, must be too small to *328 be navigable, in fact.” (See, also, Morgan v King, 35 NY 454, 458, supra.)
The bay, as noted, is not very deep, and certainly not adapted to large commercial ships. But as society developed, uses undreamed of in earlier years became commonplace and as noted in Roberts v Baumgarten (110 NY 380 supra), and Fairchild v Kraemer (11 AD 2d 232, supra) a more liberal standard of navigability became the test.
As the years went by, there was a great increase in the use of shallow water for shoal-draft pleasure craft as our industrialized economy provided the affluence and spare time needed for recreational uses. The waters of Shinnecock Bay are used constantly for this type of navigation, and in today’s life it cannot be said that this use is less important to society than commercial uses such as logging or transporting produce across the water. Indeed the court takes judicial notice that due to the relative shallow depth of this and similar bays on Long Island center board sail boats were constructed to avoid the disadvantage of a keel and to this day most sail boats on the north shore of Long Island and on Peconic Bay are keel boats, and many on the south shore are center board boats. Furthermore, most outboard motor boats can be used in quite shallow water, and many fairly large inboard cruising boats with a planing type hull also are used in water of the depth of the bay. Millions of dollars are invested in these uses. (Fairchild v Kraemer, supra.)
On tidal waters the public has the right to use the strand between high and low water for passage and other purposes (Tucci v Salzhauer, 40 AD 2d 712), and this must assume that the user of the surface of the water can beach his boat there, even though perhaps he must use the familiar row boat, or perhaps even walk.
A relevant statement is found in People v Steeplechase Park Co., (82 Misc 247, 255-256): "It is not necessary, however, to determine whether the high-water mark was forced back from where it was in 1900 to its position in 1913 by avulsion or erosion. Although where the shore recedes as the result of avulsion the boundary of the littoral proprietor may not change, the public has the same right of passage over the new foreshore as it had over the old — else an avulsion might cut off the public right of passage altogether. This will be yet more evident when we consider that this public right of passage is of the same nature as the public right of navigation *329 in navigable waters, which, all will agree, would not be lost by any change in the shore line or lines, however sudden. The practical result of the doctrine that title is not lost by avulsion so far as beach lands are concerned is that should the land reappear within the limits of the former boundaries the littoral proprietor may reclaim it. As authority for the propositions, see Mulry v Norton, 100 NY 424.”
Consequently it appears that all of Shinnecock Bay is now navigable, either in law or in fact; in law because it is now tidal, and in fact because the Court of Appeals so found in 1898 under a more stringent test than needed today.
Under either classification, the public has an easement of navigation and use over its waters.
When the general principles are considered here the result is the conclusion that the defendants have title to the farthest seaward boundaries of their deeds except such portions as have been lost by erosion or gained by accretion, subject to a right of the public for navigation and connected uses up to the present high-water mark.
Some part of the original land in the deeds has increased to the seaward due to accretion. Accretion will alter the ownership of the underlying bottom land. Thus although the trustees could not increase their title by raising the water level of the bay, they could decrease it if accretion resulted on defendants’ land. Accretion is the increase of the upland by a change so gradual as not to be perceived in any one moment of time. (Halsey v McCormick, 18 NY 147.) The riparian owner increases title by that amount, at the cost of the diminution of title of the owner of the land previously under water (here the trustees) but now covered by the accretion.
In the case last cited, the court was careful to point out that this result would not follow in the case of avulsion. The defendant there had diverted the water in his boundary stream so that bottom across the stream at the plaintiffs boundary line became exposed. The plaintiff then claimed it as accretion. The court held that since the defendant’s action caused avulsion, no title changed. The court also stated that had accretion rather than avulsion been caused by the wrongful act of a contiguous owner, it would be improbable that the wrongful actor could defeat title in the owner of the land accreted. This case is thus cited for the proposition that there is i no distinction between accretion formed by natural or artificial means. To the same effect is County of St. Clair v *330 Lovingston (23 Wall [90 US] 46). The court says at page 68: "Whether it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property.”
The Appellate Division indorses this statement in State of New York v Bishop (46 AD2d 654). Thus in our case the trustees cannot be heard to dispute any accretion to defendants’ property due to their own act of opening up Shinnecock Canal, or anyone elses’.
The defendants, of course, are also subject to loss of their upland due to erosion, but not avulsion. However, since they already owned the land under water abutting their upland at the time of the submergences, any subsequent erosion would not alter their title.
In the case of avulsion, the language in Halsey v McCormick (supra, p 149) is possibly relevant: "McCormick deepened the bed of the stream on the south side, and placed stones along the centre so as to confine the water in the channel thus deepened, and by this means the land in question was left bare. He may have been guilty, by these acts, of a violation of the riparian rights of the plaintiff or his grantors, but I know of no rule of law which would constitute an illegal act of the kind a transfer of the title.” (See, also, Reese v State of New York, 190 Misc 316.)
This court again points out that neither side adduced sufficient evidence to fix the water lines prior to the opening of Shinnecock Canal.
The argument that a man-induced higher tide would not result in compensable damages is highly questionable. Many areas on the south side of Long Island have been developed upon the water’s edge. Many homes are just slightly above the high-water plane. In areas such as Jamaica Bay, Great South Bay, Bellport Bay, Moriches Bay, Westhampton Bay, and Shinnecock Bay, an artificially-induced inlet from the sea resulting in as little as several feet of additional tide would destroy many millions of dollars of home and commercial construction and require mass evacuation of people. It is doubtful that a town could cause such a disaster with impunity. This is a far different situation than where nature breaks through the beach. If an unimpressed ocean cavalierly disregards the rules imposed by man upon real estate, man *331 must magnanimously conform his rules to the actualities or sound a reprise of King Canute’s lament.
The question next arises as to the rights, if any, of the defendants to fill in or reclaim their submerged land. A very interesting fact situation which includes almost all of the permutations of accretion and avulsion connected with an inlet is found in Town of Hempstead v Lawrence (70 Misc 52, revd 147 App Div 624), which cites Mulry v Norton (100 NY 424, 434, supra.) These cases do not set a time limit upon the owner’s right to reclaim land lost by avulsion provided that the original boundaries can be located or identified. The decisive criterion is whether the loss was due to erosion or avulsion. If one equates avulsion with sudden submergence, as this court does, the defendants have the right to reclaim their land which became submerged, but not that part of their land which was lost through erosion (Schwarzstein v B. B. Bathing Park, 203 App Div 700), unless they also owned the contiguous under-water land.
It is pointed out that defendants could identify the prior land, were it to emerge, with no difficulty within a foreseeable future, and the evidence indicates that upon its drying surface would be found ancient and not-so-ancient plants, indicating an absence of asportation of the soil.
Following the above reasoning, the court holds that the trustees do not own any land above water abutting the defendants’ property as it now exists, since they have gained no further title through accretion and in fact have lost some.
The court will now consider the rights of the public to the shore line of the premises. As stated above, the public has an easement for navigation and use over all of Shinnecock Bay and its waters. This easement includes the strand, the area between high and low water. The question now arises — where is high water?
The plaintiffs argue that high-water mark should be determined where possible, by the line formed by the growth of spartina alterniñora, commonly known as cordgrass, because this grass requires a diurnal flooding of salt water in order to grow vigorously. Therefore, it is maintained, high-water line can readily be determined by observing the line of growth. The argument is an interesting one and probably does indicate the average location of mathematical high water to a rough degree, but it has one great defect — it does not make societal sense. Words and laws should serve man; not the converse.
*332 Undoubtedly the original owners of Shinnecock Bay lands were unaware of the unique requirement of daily inundation for survival of spartina alterniñora. It would have caused more than mild shock to them to be informed by a botanist that the landowner did not own at least to the obvious water line, and that perhaps several hundred feet of vegetated sand, mud and bog separated him from low-water mark. In short, the test of high-water mark was not where it was as a matter of logic and scientific proof, but where they thought it was and, even more persuasively, where they by custom agreed it was. If in fact what they called a horse was really a cow, their scientific error would not convert the cow into a horse. Could it be imagined that if a mute colonist were to sell his waterfront land to a purchaser he would walk over to the line of spartina alterniñora and indicate that the boundary stopped there? It may well be that the existence of spartina alterniñora may logically indicate the limit of the daily fluctuation of the tides, but it has been wisely observed that logic alone may destroy mankind. The early settlers and their predecessors in England,. less interested in logic and scientific abstractions than practicalities, evolved a rule of boundary definition that worked well; and if it worked well it was good law.
The very concept of the average high-water line shows the occasional impracticability of pure logic. Evidence was introduced to show that to arrive at this datum an average should be taken of all the tides over a period of 18.6 years. Having accepted this definition, one realizes that the resultant datum may be a line never actually marked by the water itself.
Testimony showed that for hundreds of years there had been little argument about the location of the customary high-water mark in usage; it was considered the line of vegetation, or the best estimate on the sandy beach, usually shown as the line of driftwood left by high water. Inevitably, some actual error was introduced, but it was minimal compared to the utility of the practice. It is difficult to perceive what practical difference a few feet of sand or bog would make in this case for in any event the upland owner would be a riparian owner with a right of access to the water. (Town of Brookhaven v Smith, 188 NY 74.) Once a riparian owner, always a riparian owner. In fact this is probably the basic reason for the rules of accretion. (Lamprey v State of Minnesota, 52 Minn 181; see Town of Hempstead v Lawrence, 147 App Div 624, supra.)
The trustees’ sudden evangelical zeal to preserve the wet *333 lands and shore fronts of their town is commendable, but the upland owners should not be forced to bear the brunt of the shift in governmental policy. The inconsistency of the trustees’ position is obvious to one who inspects the area and is confronted by the existence of bulkheading on the waterfront properties of other owners in the same area. The failure of the trustees to make a similar claim for hundreds of years indicates that they themselves were unaware of the significance of spartina alterniñora. If in the future it should be established that through some now unknown process the daily tide went many feet further inland, would they renew their claim?
The State has been most properly concerned with the irreplaceable wetland areas of the State, and has enacted an Environmental Conservation Law to protect them. Obviously the local municipalities should aid in the proper administration of these principles. But they should not seize this current interest as an excuse to change the time-hallowed laws of private ownership. For instance, in this case the testimony of the plaintiffs disclosed that this new method of high-water determination would indicate that many acres and at least one island in the bay which had been assessed to private ownership for many years now were to be claimed as the land of the trustees. This stands as a threat to every riparian owner on the periphery of Shinnecock Bay upon whose land spartina alterniñora may be growing or once grew. (Town of North Hempstead v D.G.S. Ventures, Sup Ct, Nassau County, June 28, 1974, [McCaffrey, J.].) There are also several inherent inaccuracies in this method. For one, where is the line when the alterniñora consists of a wide band? Is it the inland edge, the seaward edge or the easy compromise of the middle which is practical but illogical? Furthermore, this line when applied to the premises here does not describe a plane; a startling anomaly indeed.
The court will not continue the argument further, but refers to the decision in Trustees of Town of Southampton v Heilner (Sup Ct, Suffolk County, Sept 27, 1972, DeLuca, J.), and the case of Dolphin Lane Assoc, v Town of Southampton (72 Misc 2d 868, affd 43 AD2d 727) and modified by the Court of Appeals (37 NY2d 292). The opinion answered the main contention of the plaintiffs adversely.
The court finds that the plaintiffs have not established the present high-water mark by survey, although it would appear *334 to be as depicted on plaintiffs’ Exhibit 6A, represented by the inshore edge of the wide blue peripheral band.
The argument that such part of the premises as was registered title cannot be lost by erosion is answered by State v Bishop (46 AD2d 654, supra) in which the court held that the owner of land registered in 1950 did not have the right to fill in that part of his land which had eroded by 1972. The court states (p 654): "Nor did the 1950 title registration judgment bind plaintiff to the location of the mean high water mark described therein, for notwithstanding that judgment, defendant, as did his predecessor, holds a title diminishable in extent by erosion and the consequent influx of the tide (Real Property Law, § 391; Matter of City of Buffalo, 206 N.Y. 319; Lawkins v City of New York, 272 App. Div. 920).”
In view of the court’s analysis of the legal principles discussed, the following dispositions are made of the plaintiffs’ requests:
(1.) A permanent injunction against the defendants filling in any land below the present discernible high-water line up to the farthest seaward line of the 1919 survey is denied.
(2.) The boundaries of the defendants’ property are as shown in the earliest survey of this property in 1919.
(3.) There is an easement in favor of the public over all land and water seaward of the average high-water line as it now exists.
(4.) An injunction prohibiting further waste and damage to the defendants’ property lying inland of their boundary line in 1919 is denied.
(5.) The.complaint is dismissed.
As for the defendants’ claims, the following dispositions are made:
1. The defendant DeMarco is ordered to close title pursuant to the contract with defendant Heilner within 30 days of the date of the entry of the order dismissing the complaint.
2. The counterclaims of the defendants will be tried upon 30 days’ notice from the date of the entry of the order dismissing the complaint.
The court would like to express its appreciation for the thoroughness of the research involved, the co-operation shown by the attorneys to each other and the court during the long *335 trial, and the lucid synthesis by all of the complex and esoteric matters pursued.