Carl A. NILSEN, Appellee,

v.

The TENNECO OIL COMPANY, a corporation, and Amoco Production Company, a corporation, Appellants.

HADSON OHIO OIL COMPANY, a corporation, J. C. Roberts and Ruth K. Roberts, husband and wife, Kendall K. Kitson, and Gretchen E. Huber, Appellees,

v.

The TENNECO OIL COMPANY, a corporation, Amoco Production Company, a corporation, and Bessie Hamby, Appellants.

No. 48399.

Supreme Court of Oklahoma.

Jan. 29, 1980.

As Corrected On Denial of Rehearing
July 21, 1980.

Porta & Bass, A Professional Corp., by James C. Bass, El Reno, for appellees.

Watson, McKenzie & Dunlevy by H. B. Watson, Jr., Oklahoma City, for appellants.

BARNES, Justice:

The appeal before us in from a quiet title action involving ownership of both the surface and mineral estates of a section of land on the South Canadian River located in Canadian County, Oklahoma.

Because the various litigants claiming ownership of the various surface and mineral rights acquired their ownership through different chains of title, with portions of the mineral estate being severed at different times, the facts in the case are complicated. Fortunately, a detailed analysis of the various chains of title is not necessary in this opinion, as those facts are not germane to issues presented.

The facts material to the issues before us are as follows: According to the Original Government Survey of the Southeast Quarter (SE/4) of Section 4, Township 11 North, Range 9 West, Indian Meridian, in Canadian County, Oklahoma, Original Government Lots 6 and 7 were to the north of the South Canadian River, with the midline of that river forming the southern boundary of both lots, with Lot 6 being adjacent to and west of Lot 7. Immediately south of the river and below a portion of Lots 6 and 7 was Government Lot 9, and immediately to the east of it was Original Government Lot 8, which was south of a portion of Lot 7. The center line of the South Canadian River constituted the northern boundary of Lot 8 and Lot 9. Thus, the South Canadian River formed the boundaries between the lots north of the river, Lots 6 and 7, and the lots south of the river, Lots 8 and 9. Over the years, the bed of the South Canadian River has migrated to the north. As the river moved to the north, new land accumulated between the river's new south bank and old Government Lots 8 and 9.

Appellants, who own various property interests in Lots 8 and 9, claim title to the newly formed land by virtue of accretion, while Appellees claim title to the same land by virtue of their having adversely possessed portions of the land in question, and by virtue of their position that the river moved by evulsion—not accretion.

See Diagram I, which depicts the location of the river and the Government Lots at the time of trial. The new land which has accumulated south of the river is shown in the Diagram as portions of Lots 8 and 9.

The mineral estate of Lot 6 was severed from the surface estate in 1962. The present owners of the surface estate are Appellees, Jess C. and Ruth K. Roberts. The mineral estate of Lot 6 is owned by Appellees, Kendall Kitson and Gretchen Huber, and the mineral lessee is Appellee, Hadson Ohio Oil Company.

The mineral estate in Lot 7 was severed from the surface estate in 1930, when the United States patented that land, reserving the mineral estate. Appellees Roberts own the surface estate, and the United States Government still owns the mineral estate, subject to the lease of Appellee, Carl Nilsen.

Appellees Roberts also own the surface estate of Lot 8. The mineral estate of Lot 8, which was severed from the surface in

1972, is owned by Maurice and Viola Seigle and William and Marie Boston (neither the Seigles nor the Bostons are parties here), and the mineral lessees are Appellants, Tenneco Oil Company and Amoco Production Company.

The mineral and surface estates in Lot 9 have never been severed. Both estates are owned by Appellant, Bessie Hamby, subject to a surface lease to Clifford McBee and a mineral lease to Appellant, Tenneco Oil Company.

See Diagram II, which illustrates the various ownership interests in Lots 6, 7, 8 and 9.

In quieting title, the trial court held that the river had moved northward by virtue of accretion, and that therefore the movement of the river's midline affected title to the land.

LOT 9

1  Surface and Minerals owned by Appellant Hamby
2.  Surface Lessee McBee
3  Mineral Lessee/Appellant Tenneco Oil Co.
4.  Minerals and surface never severed

LOT 8

1.  Surface owned by Appellees Roberts
2.  Minerals owned by Siegle and Boston
3  Mineral Lessees Tenneco Oil Co  and Amoco Production Co.
4  Minerals severed from surface in 1972

However, title to all of the surface south of the river was not quieted in the names of the Appellants, owners of the lots adjacent to the accreted land, for the trial court held that Appellees Roberts had obtained title to a portion of the surface estate south of the river's midline by virtue of adverse possession. Additionally, the trial court quieted title to the mineral estates in question in the Appellees and their mineral lessees, ruling that once a mineral estate is severed from the surface, it can no longer be diminished by accretion or erosion.

■ Before discussing the merits of the case before us, it is necessary for us, first, to address Appellees' assertion that the appeal should be dismissed, as the Petition in Error is too indefinite with respect to the assignments of error. Although we do agree that some of the assignments of error could have been stated more specifically, we cannot say that they were so indefinite as to require dismissal of the appeal. Appellants' allegations that (1) the judgment was not sustained by sufficient evidence, and (2) that the trial court erred in overruling Appellants' demurrer to the evidence, were alone sufficient to raise the issues before us, as the issues briefed were fairly comprised with the grounds alleged. We would also note that our once rigid rule with respect to Petitions in Error has since 1969 been abandoned. With the adoption of Rule 1.17 of the Rules of Appellate Procedure in Civil Cases, this Court provided for amendments to Petitions in Error at any time before the brief in chief is filed and, thereafter, with permission of the Court. In the case before us, the Appellants have offered to amend their Petition in Error, making it more specific, if we found it necessary. As the issues briefed by Appellants are fairly comprised within the assertions of error alleged, we deem it unnecessary to require amendments to the Petition in Error. For the above stated reasons, we reject Appellees'

DIAGRAM I

DIAGRAM II

LOT 6

1  Surface estate owned by Appellees Roberts
2.  Mineral estate owned by Appellees Huber and Kitson
3.  Mineral Lessee/Appellee Hadson Ohio Oil Co.
4.  Minerals severed from minerals in 1962.

LOT 7

1  Surface owned by Appellees Roberts
2.  Minerals owned by the United States
3  Mineral Lessee/Appellee Nilsen
4.  Minerals severed from surface in 1930.

position that the appeal should be dismissed due to inadequacies in the Petition in Error. Having so held, we will now address the merits of the case.

## I.

■ Although Appellants do not question the trial court's ruling with respect to whether or not the movement of the river was by virtue of accretion, Appellees raised that question, and argue that they have a right to do so, even though they did not file a cross-appeal. It has long been the law in this jurisdiction that a successful party may, without cross-appeal or assigning errors, save the judgment below by showing that errors were committed against him or her below, which, if corrected, would make the result reached below correct.[1] Appellees argue that if the trial court had ruled that the movement of the river was an avulsive one, the result reached by the trial court would be substantially the same, and therefore they may legitimately seek review of the trial court's determination of that fact question under the above quoted rule of appellate procedure. We agree with the Appellees' analysis of appellate procedure, and therefore must review the trial court's ruling.

■■ In a case of equitable cognizance, this Court must examine the record and weigh the evidence, and the judgment will be sustained on appeal unless it is found to be against the clear weight of the evidence.[2] As a quiet title action is one of equitable cognizance,[3] the trial court's determination must be left undisturbed unless, after examining the entire record, it is clearly against the weight of the evidence.

■ In examining the record, we find the evidence of the river's movement to be conflicting, and at times confusing. Yet, we cannot say that the trial court's ruling that the river had moved by virtue of accretion and erosion was clearly against the weight of the evidence. Therefore, we must affirm the trial court's holding.

## II.

■ Having affirmed the trial court's ruling that the land south of the river was accreted land, we next determine whether Appellees Roberts' claim to a portion of the accreted land, by virtue of adverse possession, was supported by the evidence. We hold that it was not. As we stated in our first syllabus in the case of Norman v. Smedley, Okl., 363 P.2d 839 (1961):

"The party relying on a title by adverse possession has the burden of proving all the facts necessary to establish such a title. Adverse possession is to be taken strictly, and every presumption is in favor of a possession in subordination to the rightful owner. Title by adverse possession, therefore, must be established by clear and positive proof. It cannot be made out by inference. All of its constituent elements must be established. Thus it is necessary to prove an actual, open, notorious, exclusive, and hostile possession for the full statutory period." [Emphasis added]

In the case before us, the Roberts had not had possession of the land claimed for the full statutory period. Thus, in order to prevail, the Roberts had to tack their possession with that of their predecessors. The only testimony to justify tacking was Mr. Roberts' own testimony. He testified in a conclusionary manner that his predecessors in title had possessed the land openly, hostilely, and exclusively. No evidence was introduced to support these conclusions, and thus it can hardly be said that Roberts' claim of adverse possession was shown by clear and positive evidence.

---

1. *Short v. Guy Nall Trucking Co.*, Okl., 442 P.2d 497 (1968); *Woolfolk v. Semrod*, Okl., 351 P.2d 742 (1960); and *American Nat. Bank of Oklahoma City v. Ardmoreite Pub. Co.*, 123 Okl. 225, 253 P. 81 (1927). Also see *Gumerson v. Farha*, Okl.App., 538 P.2d 617 (1975).

2. E. g., *Mulkey v. Blankenship*, Okl., 558 P.2d 398 (1976); and *Long v. Anderson*, 77 Okl. 95, 186 P. 944 (1920).

3. See, e. g., *Bates v. Old Mac Coal Co.*, Okl., 271 P.2d 315 (1954); and *Keith v. Lawson*, 195 Okl. 157, 155 P.2d 716 (1945).

Additionally, Mr. Roberts himself testified that he was *assuming* that portions of the land were occupied by his predecessors. In response to Appellants' attorney's question, "But you are assuming your predecessors in title occupied that land and had a fence there?", Mr. Roberts replied, "Yes".

We would also note that even if the Roberts had been able to show that their predecessors had adversely possessed the land, there was conflicting and confusing evidence concerning the exclusiveness of the Roberts' possession.

For the reasons stated above, we hold that the Roberts' adverse possession claim was not supported by clear and positive evidence, and that the trial court, therefore, erred in holding that the Roberts had acquired title by adverse possession.

### III.

■ We next consider whether the movement of a river by erosion or accretion carries with it title to the underlying minerals, when the minerals have been severed from the surface estate. The trial court held that once the minerals are severed, title to the mineral estate may *not* be lost by accretion or erosion.

In making this holding, the trial court relied upon *Deruy v. Noah, 199 Okl. 230, 185 P.2d 189 (1947), and Braddock v. Wilkins, 182 Okl. 5, 75 P.2d 1139 (1938).* Neither of these cases addressed the issue before us. The *Braddock* case involved a quiet title action in which two claimants asserted their title to land which had accreted to a government lot. The case turns upon the descriptions in the deeds by which the parties claimed title. In that case, we merely held that the conveyance of government lots, by lot number, conveyed not only the original lot but all accretions thereto, and that the notation of total acreage conveyed in the deed did not deprive the grantee of future accretions. Neither our holding nor the issues in that case considered what effect, if any, a severance of the mineral estate from the surface estate would have upon the alteration of title by accretion. Thus, we find the case of no help in determining the issue before us.

The *Deruy* case sheds more light upon the trial court's analysis, but, like *Braddock*, does not address the issues before us. In that case, a purchaser of a sheriff's deed, who adversely possessed the land for more than five years, claimed a total fee interest despite the fact that the minerals had, prior to his acquiring the land, been severed from the surface and the mineral owner had not been a party in the foreclosure action. The issue presented in the case was: whether the purchaser of a sheriff's deed, who goes into possession, was holding adversely to the mineral estate owner. In addressing that issue, we stated:

"The general rule is: 'The decisions are unanimous in holding that where the title to the mineral right has been severed from the title to the surface, possession of the surface by its owner is not adverse to the owner of the mineral[s] below it. The mineral owner does not lose his possession by any length of nonuser, and the surface owner cannot acquire title to the minerals by adverse possession based on his exclusive and continued occupancy of the surface alone. It is said that inasmuch as the severance of the title of the mineral estate from the surface estate creates two estates which are as distinct as if they constituted two different parcels of land, it naturally follows that the title to one cannot be acquired by adverse possession of the other. Nor is the rule changed by the fact that the possession of the surface is under a deed that describes the lands by metes and bounds and makes no reference to the mineral rights reserved by an earlier deed.'" [Quoting from 1 Am.Jur. pp. 858, 859.]

In that case, we went on to hold that where ownership of the surface and mineral rights have been severed, the only way the Statute of Limitations can be asserted against the owner of the mineral estate is for the owner of the surface estate, or some other person, to take actual possession of the minerals by opening and operating mines for the statutory period.

The Appellees, and apparently the trial court, put great emphasis upon the language in *Deruy*, inasmuch as the severance of the minerals from the surface was said to create two estates which are as distinct as if they had constituted two different parcels of land. Apparently reasoning by analogy, the trial court concluded that if a severed mineral estate could not be acquired by possession of the surface, then the movement of water on the surface should have no effect on the ownership of the mineral estate. Three considerations militate against the trial court's analysis. First, the trial court failed to recognize that the adverse possession cases were Statute of Limitations cases, and not property right cases. The reason that adverse possession of the surface does not constitute adverse possession of the severed mineral estate underlying the surface is that the possession of the surface alone does not constitute an interference with the rights of a mineral estate owner, and therefore it does not constitute an open, obvious, and notorious claim on the mineral owner's estate.[4] Thus, when the adverse possessor of the surface does not mine, prospect, drill, or otherwise interfere with the mineral owner's estate, use of the surface by the adverse possessor is entirely consistent with the rights of the mineral owner,[5] and thus the Statute of Limitations does not begin to run against the mineral owner, as he has no cause to complain. It appears that the trial court misinterpreted the Statute of Limitations cases, construing them as cases defining estates in real property. In this respect, we hold the trial court erred.

Second, the trial court's holding that a severed mineral estate could not be lost by accretion or erosion would allow fee owners to convey a greater mineral estate than they themselves possessed. It is an axiomatic principle of law that a grantor cannot convey an estate greater than that possessed by him.[6] It is also a well-settled rule of law that when nature causes a gradual shift in the line which separates riparian land from the abutting water, due either to recission of the water or the deposit of soil against the margin of the land, there occurs a change in the boundary between the land and the waterbed so that the owner of the original waterbed has lost title to that part of it which is now land, and the owner of the original body of land has acquired title to the new land thus formed.[7] This common law rule is codified in Oklahoma at 60 O.S.1971, § 335.[8] Under this rule, the riparian owner may *lose or gain* land as a result of the movement of a river. A fee owner of riparian land could, accordingly, lose a portion of his fee if the river gradually encroached upon his land. His loss would be all encompassing, that is, it would include a loss of all possible rights, title and interest in the land, both surface and minerals. Despite the fact that the trial court recognized that a fee owner's mineral interest could be lost by virtue of accretion, the trial court implicitly held that if the fee owner conveyed his mineral estate only, or conveyed his surface estate retaining the

4. *Hassell v. Texaco, Inc.*, Okl., 372 P.2d 233 (1962); *Strickland v. Reeburgh*, Okl., 362 P.2d 1110 (1961); *Churchill v. Muegge*, Okl., 323 P.2d 339 (1958); and *Deruy v. Noah*, 199 Okl. 230, 185 P.2d 189 (1947).

5. See *Deruy v. Noah*, 199 Okl. 230, 185 P.2d 189 (1947).

6. *Lovett v. Stone*, 239 N.C. 206, 79 S.E.2d 479 (1954). Also see *Lahman v. Bassel*, Okl., 373 P.2d 245 (1962); *Ball v. Coyle*, 108 Okl. 30, 233 P. 750 (1945); and *Allison v. Thomas*, 72 Cal. 562, 14 P. 309 (1887).

7. *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); *Trustees, etc., of Town of South Hampton v. Heilner*, 84 Misc.2d 318, 375 N.Y.S.2d 761 (1975); *Maston v. State*, 12 Wash.App. 635, 531 P.2d 836 (1975); *Jefferis v. East Omaha Land Co.*, 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1889); *City of Oakland v. Buteau*, 180 Cal. 83, 179 P. 170 (1919); *Martin v. Busch*, 93 Fla. 535, 112 So. 274 (1927); *Miller v. Lincoln Park*, 278 Ill. 400, 116 N.E. 178 (1917).

8. Title 60 O.S.1971, § 335, provides:
   "Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not, either by accumulation of material or by recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

minerals, the mineral estate would no longer be subject to loss through accretion. Thus, under the trial court's analysis, when the mineral estates are conveyed, the mineral estate conveyed would constitute a greater estate than that held by the fee owner, as the fee owner's mineral interest was subject to loss, and the grantee's interest would not be.

We hold that such an analysis would be contra to the general rule that grantors cannot convey greater estates than they themselves possess.

Third, we hold that the trial court's ruling would bring about gross inequities. Under the trial court's holding, a non-severed mineral estate would still be subject to loss by virtue of accretion or erosion, while a severed mineral estate would not be subject to such loss. Thus, in situations in which a severed mineral interest and a non-severed interest are separated by a waterway which constitutes a common boundary, the person owning the severed interest could increase his or her estate by virtue of accretion or erosion, but never have it decreased, while the owner of the non-severed interest could have his or her mineral interest decreased, but could never gain. Such a situation is hardly equitable. In *Jefferis v. East Omaha Land Co., 134 U.S. 178, 189, 10 S.Ct. 518, 520, 33 L.Ed. 872, 876 (1889)*, the Supreme Court of the United States stated:

"It is distinctly alleged in the bill that the new land is an accretion to that originally purchased by the patentee from the United States. The rule of law applicable to such a state of facts is thus stated by this court in *New Orleans v. United States*, 35 U.S. 10 Pet. 662, 717, 9 L.Ed. 573 [9:573, 594]: 'The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. *No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without reme-*

*dy for his loss in this way, he cannot be held accountable for his gain.'* And in *Banks v. Ogden*, 69 U.S. 2 Wall. 57, 67, 17 L.Ed. 818 [17:818, 821], it is said: 'The rule governing additions made to land bounded by a river, lake or sea, has been much discussed and variously settled by usage and by positive law. Almost all jurists and legislators, however, both ancient and modern, have agreed that the owner of the land thus bounded is entitled to these additions. *By some, the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion*; by others, it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore itself.' " [Emphasis added.]

If we were to embrace the trial court's rationale, principles of natural justice would be violated, as one's land would be subject to loss, but never capable of gain. For this reason, and for the reasons discussed above, we hold that the trial court erred in holding that mineral interests, once severed, may not be diminished through erosion or accretion. Accordingly, we must also hold that the trial court's quieting of title based upon that principle was also in error.

In so ruling, we feel it necessary to address an argument made by Appellees, both in their brief and in oral argument. Appellees contended that the adoption of any rule other than that announced by the trial court would deny the owners of severed mineral interests an opportunity to protect their interests, if they find themselves in a situation similar to the one before us. Appellees' position is founded upon the belief that it is fundamental that the owner of a severed mineral estate cannot take steps to control or attempt to control the movement of the river. We do not agree with Appellees' contention. Although it was not al-

ways the case,[9] this jurisdiction has for quite some time adopted the view that if an instrument conveying mineral interests does not specifically provide for the right of ingress and egress, such rights will be implied in law if there are no express provisions in the instrument which negate such an implication.[10] More recently, in *Holt v. Southwest Antioch Sand Unit, Fifth Enlarged, Okl., 292 P.2d 998, 998 (1956)*, we stated in our first syllabus that:

> "Generally a person who owns minerals in land has as incidental to his ownership the *right and privileges that are necessary for profitable production of such minerals*." [Emphasis added]

In *Mack Oil Company v. Laurence, Okl., 389 P.2d 955 (1964)*, we held that such rights include the right to use water under the surface for purposes necessary and incidental to the grantee's mineral operations.

■ As the grantee of a mineral estate has, as incidental to his ownership, the rights and privileges that are *necessary for profitable production of such minerals*, such rights and privileges would, given the proper circumstances, include the right to take measures to protect his interest and investment from loss due to erosion or accretion, unless the instrument involved indicated otherwise. Thus, we find no merit to Appellees' argument.

For the above stated reasons, the judgment of the trial court is reversed and the case remanded to the trial court with directions to quiet title to the land in a manner consistent with the holdings announced in this opinion.

REVERSED AND REMANDED.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS, SIMMS and OPALA, JJ., concur.

DOOLIN, J., dissents.

HODGES, J., joins the dissent of DOOLIN, J.

DOOLIN, Justice, concurring in part; dissenting in part.

This is a case of first impression.

I concur with the conclusion of the majority as to non-severed mineral interests. I cannot agree with the majority in regard to its treatment of severed mineral estates.

Oklahoma, it is true, has adopted the common law doctrine of riparian rights (12 O.S.1971 § 2). Riparian in its strict sense is descriptive of the right attaching or belonging to land *bordering, touching,* or *adjacent* to a stream. Thus, lands are riparian that lie along or border a stream, and littoral if bounded by a sea, tidal water or a considerable body of water. It is fundamental that accretion cannot occur *unless* the land to which it attaches bounds the stream and is contiguous thereto.[1]

Although common law riparian rights reflect a long history in Anglo-American law they should not be sacrosanct or enlarged upon except for good cause. Various state courts have found it necessary to curtail, abrogate and modify principles of common law, especially with regard to water rights.[2]

Our adoption statute, 12 O.S.1971 § 2, states the common law may be modified by the "conditions and wants of the people"

---

9. See *Newbern v. Gould*, 162 Okl. 82, 19 P.2d 157 (1933).

10. The State first embraced this view in *Douglas v. Douglas*, 176 Okl. 378, 56 P.2d 362 (1936). In this case, we overruled our prior decision in *Newbern v. Gould*, cited in footnote 9 above. Also see *Melton v. Sneed*, 188 Okl. 388, 109 P.2d 509 (1941).

1. *Spreckels v. Brown*, 212 U.S. 208, 29 S.Ct. 256, 58 L.Ed. 476 (1909); *Fowler v. Wood*, 73 Kan. 511, 85 P. 763 (1906); *Gubser v. Town*, 202 Or. 55, 273 P.2d 430 (1954) and *Olsen v. Jones*, 412 P.2d 162 (Okl.1966).

2. *San Joaquin & King's River Canal & Irrigation Co. v. Fresno Flume & Irrigation Co., 158 Cal. 626, 112 P. 182 (1910)*. The California Court held: "If a rule of common law is unfitted to the changed conditions existing in this state, so that its application will work hardship, the Supreme Court will not follow it. See also *Reno Smelting, Milling and Reduction Works v. Stevenson, 20 Nev. 269, 21 P. 317 (1889); Coffin v. Left Hand Ditch Co., 6 Colo. 443 (1882).* Cf. *Clark v. Allaman, 71 Kan. 206, 80 P. 571 (1905); Canada v. City of Shawnee, 179 Okl. 53, 64 P.2d 694 (1937).*

and "by judicial decision." Thus, if we accept the basic premise of the necessity of contiguity before accretion may involve, we must find severed mineral interests in a fugacious substance (oil and gas) are *contiguous* to the stream. In my opinion, accretion to an interest in reality of fugacious matter is *impossible* after the adoption and development of Oklahoma's theories as to severed mineral interests. 12 O.S.1971 § 2 provides for modification of the common law doctrines, and we have long ago approved a modification of such doctrines by the development or theory of severed mineral interests. The act of severance or reservation of mineral interests in real property common to oil and gas transactions creates two separate estates, surface and mineral. These estates are as separate as the fingers of the hand, or as two parcels of land.[3] The end result of accretion and prescription is the same, albeit. One is the result of an Act of God or "vis major" and the other the affirmative action of a person. Logically, can a "force majeure" bring about a different result from an affirmative act of man?

I would not do violence to the common law doctrine of accretion. It protects the right of the riparian or littoral owner to the accumulation of precious metals or stones on the bank of the stream as well as his right to the alluvial soil itself.[4] But not so, separate mineral estates such as oil and gas that are locked deep in the bowels of the earth, for they are separate fingers, parcels or estates in the land.

I would also make it clear that severed mineral interests may never increase their interest by the process of accretion.

The final mischief created or propounded by the majority is the implied right granted to a severed mineral owner to go upon the surface and protect his estate. This, I suggest, makes the surface estate subservient to and burdened with a dominant tenement of an unprecedented nature.

What rights have been granted to such a mineral owner? Has the mineral owner been afforded species of private eminent domain? If the surface is being used for agricultural purposes or other beneficial uses, what weirs, what levies, fills, dead men, lines, cables or other paraphernalia are to be allowed? The majority's new right is scarcely equivalent to the implied covenants to develop found in the law of oil and gas for only a right to capture or explore was intended in the instant mineral conveyance.

I have grave doubts the English common law, as imported into this nation at prerevolutionary times and thence to us, contemplated, encompassed or understood the nature of severed mineral estates of a fugacious nature. It is the genius of the common law as set forth in § 2, supra, which has allowed modification by judicial decisions. In sum, the majority seeks to enforce a common law right which has been previously modified by judicial decision. It assumes that such a right exists in Oklahoma. I doubt that it does, inasmuch as severed mineral interests were unheard of and unknown at the time of development of riparian rights and trafficking in mineral interests began in Oklahoma long before statehood.

Severed mineral estates have long been recognized in Oklahoma. In *Cuff v. Koslosky, 165 Okl. 135, 25 P.2d 290, 294 (1933)*, we recognized that an appraisement under 12 O.S.1971 § 759 was necessary before a severed mineral estate could be sold. In *Martin v. Atkinson, Warren & Henley Co., 195 Okl. 19, 154 P.2d 945, 946 (1945)*, we held holders of severed mineral estates must be served with notice before such right can be extinguished by a certificate tax deed; to the same effect see *Walker v. Hoffman, 405 P.2d 57 (Okl.1965)*.[5] Likewise, *Douglass v. Mounce, 303 P.2d 430 (Okl.1956)*. *Sautbine v. Keller, 423 P.2d 447 (Okl.1966)* and *Gesell*

---

3. *Deruy v. Noah, 199 Okl. 230, 185 P.2d 189, 191 (1947)* and *May v. Archer, 302 P.2d 768, 770 (Okl.1956)*.

4. Treasure trove is the property of the owner on whose land it is found, as is lost or stolen property his against all but the true owner.

5. 68 O.S.Supp.1979 § 24323.1 indicates the legislative intent to uphold the rights of severed mineral estates and amendment of the common law.

*v. Martin, 463 P.2d 697 (Okl.App.1969)* indicate that adverse possession of surface estate will not affect the severed mineral estate. They hold the only manner in which a person may acquire title or interest in minerals by adverse possession . . . is to take by opening and operating mines for the statutory period, *Mohoma Oil Co. v. Ambassador Oil Co., 474 P.2d 950, 960 (Okl. 1970).*

In my opinion the stability of land titles and the sanctity of private ownership of property dictates that this Court adopt the following doctrines:

1. Rights of severed mineral holders are well established in Oklahoma and should be upheld.
2. The common rule of accretion was never intended to apply to severed mineral estates.
3. Accretion to severed mineral estates is impossible because there is no contiguity.
4. There can be no implied right to burden the surface with the paraphernalia or burdens of a subservient tenement.

I dissent as to accreting rights of severed mineral owners.

