No. 83-87

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

ALICE E. JACKSON, et al.,

                        Plaintiffs and Respondents,

    vs.

BURLINGTON NORTHERN INC., et al.,

                        Defendant and Appellant,

    and

THE STATE OF MONTANA,

                        Intervenor and Respondent.

---

Appeal from:  District Court of the  Seventh Judicial District,
              In and for the County of Richland
              Honorable R. C. McDonough, Judge presiding.

Counsel of Record:

    For Appellant:

        Gary H. Peterson argued, Englewood, Colorado

    For Respondents:

        Habedank, Cumming & Best, Sidney, Montana
        Thomas R. Halvorson  argued, Sidney, Montana

    For Intervenor:

        David Woodgerd, Special Assistant Attorney General, argued
        Helena, Montana

---

                            Submitted:  June 3, 1983

                            Decided·  July 21, 1983

Filed:  JUL 21 1983

_____
                        Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

The Seventh Judicial District Court, in and of the State of Montana, entered an order quieting title to certain property situated in Richland County, Montana, in plaintiffs, Alice E. Jackson, et al., (the Jacksons). Defendant Burlington Northern, Inc., (BN) appeals. We affirm.

A question of first impression is presented to this Court, viz., whether a severed mineral estate bordering a navigable waterway is subject to the doctrines of accretion and/or erosion?

The term "accretion" describes (1) a process by which land is formed by imperceptible degrees upon the bank of a river or stream, either by accumulation of material or by recession of the stream, (also called reliction) and (2) a rule of law which establishes that lands created by such process belong to the owner of the bank, sometimes referred to as the riparian owner, or his grantee, absent exception or reservation. 7 Powell on Real Property, 607-611; 78 Am.Jur.2d, Waters, §§406,411. Erosion is the process by which the action of water gradually washes away land bordering on a stream; the doctrine of erosion recogizes that a riparian owner loses title to lands subjected to such a process. Ibid.

BN's predecessor in interest received a patent from the United States Government in 1864 which included Lots 1-5 and the E½ of Section 25, Township 23 North (T23N), Range 59 East (R59E), M.P.M., Richland County, Montana. This grant represented all of Section 25 but the bed of the Yellowstone River which traversed its western edge.

In 1905, Lot 5, which then consisted of 1.81 acres located west of the Yellowstone River, was transferred to William and John Meadors, with a reservation of coal and iron

2

interests.   In 1918 the reserved mineral interests were quitclaimed to the Meadors.   The Jacksons succeeded to the Meadors' interest in Lot 5.

Surface ownership of Lots 1-4 was transferred by three deeds in 1938 to three separate groups of grantees; mineral rights were expressly excepted and reserved by BN's precedessors in interest.   Thus, the mineral estate for Lots 1-4 was effectively severed from the surface estates.   Later BN acquired ownership of the severed mineral estate.

Since 1884, when the original survey of Sections 25 and 26, T23N, R59E, was done, the Yellowstone River has become narrower and has moved eastward.   Exhibit J, a rendition of which is included in Appendix I, depicts that movement by detailing a composite of the 1884 survey and a 1975 survey of those sections.   As a result of the River's movement, there are now approximately 159 acres lying west of the River in Section 25.   (See Diagram, Appendix I)

On August 16, 1979, the Jacksons commenced this action to quiet title to that part of Section 25 which lies west of the Yellowstone River.   They specifically claimed ownership in Lot 5 and the accretion thereto.   BN claimed ownership of all mineral interests in Section 25, excepting Lot 5 and the bed of the Yellowstone River as surveyed in 1884.   Thus, both parties claimed ownership of the mineral interests underlying the cross-hatched area on Exhibit J.   (Appendix I)

The State of Montana intervened when it determined that its interests would be adversely affected were the court to adopt BN's theory that severed mineral estates bordering navigable waterways are not subject to accretion or erosion. The State claims ownership of the riverbed adjacent to the subject property.

Further explanation of the interests claimed by the remaining parties is not essential.   It will suffice to note

3

that (1) Holly Sugar Corporation owns 2/33rd interest in the mineral rights on Lot 5; (2) Shell Oil Company holds exploration and development rights in Section 25 by virtue of several leases with the parties and the State of Montana; and (3) on April 20, 1976, Shell Oil brought in a producing oil well on the Northwest quarter (NW¼) of Section 25, east of the Yellowstone River.

In the first instance, BN filed a motion for summary judgment, which was denied. BN appealed, and this Court dismissed the appeal without prejudice. Jackson v. Burlington Northern, Inc. (1982), ____ Mont. ____, 652 P.2d 223, 39 St.Rep. 1998. The cause was returned to the District Court, whereupon motions for summary judgment were filed by the Jacksons and Holly Sugar Corporation. Additionally the parties stipulated:

"(1) That the Yellowstone River in Section 25, Township Twenty-three North (T23N), Range Fifty-nine East (R59E), M.P.M., Richland County, Montana, is a navigable river.

"(2) That the movement of the Yellowstone River in Section 25, T23N, R59E, MPM, Richland County, Montana, during all times material to this cause of action, was accretive in nature."

On January 14, 1983, the District Court entered its findings of fact, conclusions of law, opinion, and order granting summary judgment in favor of the Jacksons and Holly Sugar Corporation.

Judge McDonough concluded that:

(1) the movement of the Yellowstone River at all times material was accretive rather than avulsive in nature;

(2) a riparian owner has a vested right to accreted and future accreted land, inherent in his ownership of his original property;

(3) a riparian owner cannot be divested of such right as to minerals situated within the accreted land by reason of a prior exception of minerals by the owner across the river.

4

In part, Judge McDonough relied on Nilsen v. Tenneco Oil Co. (Okla. 1980), 614 P.2d 36, which held that a severed mineral estate could be increased by accretion and diminished by erosion.

Apparently Nilsen is the only case that expressly decides the issue before this Court.

BN contends that we should reject the rule of Nilsen and hold that the boundaries of a severed mineral estate bordering a navigable stream become fixed as of the date of severance. Thus, whatever impact may be had on a surface estate, a severed mineral estate could be neither increased or decreased as a result of processes of accretion or erosion.

We expressly reject the rule proffered by BN and adopt the rule of Nilsen.

In 1895 the rule established by both the Legislature and this Court, was that the State owned the land below navigable waterways. Sec. 1091, Civ. C. 1895, re-enacted at Section 70-1-202, MCA, (1981); Gibson v. Kelly (1895), 15 Mont. 417, 39 P. 517. Having recognized the word "land" includes not only the surface but also everything under it and over it, Gas Products Co. v. Rankin (1922), 63 Mont 372, 389, 207 P. 993, 997, it necessarily follows that the State owns the mineral rights below navigable steams.

Were this Court to adopt the rule proposed by BN, the State's ownership interests would not correspond to gradual changes in the course of a waterway but be subject to the caprice of a riparian owner who opts to sever his surface estate from his mineral estate. Under BN's rule the perimeters of state ownership would be necessarily constricted as of any particular severance date. Furthermore, development of privately owned minerals underlying navigable waterways could interfere with the

5

public's right to navigate, whether for commercial or recreational purposes.

An illustration employed by the States' counsel during oral argument ably reveals the consequences of adopting BN's rule, as opposed to the rule of Nilsen.

The following diagram depicts a change of course in a navigable stream whereby the stream gradually moves toward the bank of a severed mineral owner and away from the bank of a non-severed mineral owner. (See illustration below)

ILLUSTRATION



Under BN's proposed rule, the boundary of the severed mineral estate would be fixed in accordance with the low water mark along the western edge of the old stream channel. The western boundary of the non-severed mineral estate would initially coincide with the low water mark on the east bank of the stream.

As the stream moved westward over time, the western boundary of the non-severed mineral estate would correspondingly shift, until such point the east bank of the new stream channel intersected the west bank of the old

stream channel. At that point, the common boundary between the severed and non-severed mineral estates would coincide with the west bank of the old stream channel.

Consequences of such a rule are manifest. First, the non-severed mineral owner would hold incongruent surface and mineral estates, despite his intentions or the intent of his grantors. In accordance with the doctrine of accretion, recognized in Montana by statute and case law, section 70-18-201, MCA, and the cases following Bode v. Rollwitz (1921), 60 Mont. 481, 491, 199 P. 688, 691, the surface estate would extend to the eastern bank of the new stream channel; however, the non-severed mineral estate would only extend to the west bank of the old stream channel. Furthermore, the resulting incongruity would not be evident from examination of the chain of title to the affected properties.

Secondly, the State would be divested of its ownership in the land underlying that part of the new stream channel which lies west of the boundary line for severance purposes. Such a result is clearly contrary to the mandate of Section 70-1-202, MCA, (1981).

Additionally, under BN's rule, mineral estate boundaries would be difficult to determine. Critical to application of the proposed rule would be establishment of the course of a navigable waterway as of the date a mineral estate is severed from a surface estate. Such information may not be accessible. The instant matter provides a good example of the difficulty inherent in such a rule.

As shown by Exhibit J, BN claims ownership of a mineral estate which includes that portion of the W½ of Section 25 which lay east of the Yellowstone River as it flowed in 1884. The record is devoid of any evidence tending to prove the course of the Yellowstone River as of the date(s) BN's

7

predecessor in interest severed the mineral estate from the surface estate. According to BN's brief, severance occurred September, 1938. Thus, BN propounds a rule which defies application given the state of the record at the time of the various motions for summary judgment. We would surmise that a 1938 survey of the subject properties was not readily available, and that other owners of severed mineral estates might have like difficulties locating surveys which correspond with pertinent severance dates.

We believe the District Court acted wisely in adopting the rule of Nilson. We hold that a severed mineral estate is subject to the doctrines of accretion and erosion, and that prior exception by a riparian owner on one side of a navigable waterway will not work to divest either the State or another riparian owner of its (his) ownership in lands underlying navigable waterways or minerals situated in accreted lands.

Affirmed.

Justice

We concur:

Chief Justice

Justices

Hon. Frank Davis, District Judge,
sitting in place of Mr. Justice
L.C. Gulbrandson

8

HON. FRANK DAVIS, District Judge, sitting in place of MR. JUSTICE L. C. GULBRANDSON, DISSENTS.

I dissent.

This case is not only one of first impression in Montana; it apparently is only one of two in the entire scope of Anglo-American law.

The majority opinion has disposed of this important case primarily on a real and an imaginative peripheral issue raised by the Intervenor State, e.g., the ownership of the stream bed of a navigable stream. I say "imagined" because the opinion actually injects a recreational concept of navigability which, at least up until now, has never been determined by this Court.

It seems to me that it is the duty of this Court to balance the admitted interest of the State with the more fundamental issue of the long held concept of the nature of a severed mineral interest. That concept is so well settled that it is not going to disappear because the majority has failed to address it. Instead, this decision, in my opinion, will have a devastating impact on existing contractual obligations involving severed mineral interests. The problems are going to be unending. This Court is losing the opportunity to establish a needed precedent in an area so vital to this State's important mining industry and the thousands of landowners who have opted, as has the Defendant here, to retain a valuable property right by severance.

It has long been the law in this State that mineral interests of all types could be segregated, both in whole and in part, from the fee simple estate. The practice is a common one, a valuable property right, and the subject of thousands of contracts, leases and related agreements. Johnson v. Unknown Heirs, 140 Mont. 128, 368 P.2d 577 (1962); Stokes v. Tutvet, 134 Mont. 250, 328 P.2d 1096 (1958); Voyta v. Clonts,

134 Mont. 250, 328 P.2d 655 (1958); In re Hume's Estate, 128

Mont. 223, 272 P.2d 999 (1954); Rist v. Toole County, 117

Mont. 426, 159 P.2d 340 (1945); Krutzfeld v. Stephenson, 86

Mont. 463, 284 P. 553 (1930); Broderick v. Stephenson

Consolidated Oil Co., 88 Mont. 34, 290 P. 244 (1930).

The majority is adopting as the law of this State, a

divided Court's decision from Oklahoma (Nilsen v. Tenneco Oil

Company, 614 P.2d 36, 1980). In my judgment, this precedent

is a weak reed for this Court to rely upon. The trial Court

in Oklahoma had held that once a mineral estate had been

severed, title to that estate could not be lost by accretion.

The trial Court was reversed; but in a well reasoned, scholarly

dissent by two Justices, the dissenters had this to say, which

is most applicable to this Montana case:

> "These estates are as separate as the fingers of the
> hand, or as two parcels of land. (Emphasis supplied.)
>
> * * *
>
> I would not do violence to the common law doctrine of
> accretion. It protects the right of the riparian or
> litoral owner to the accumulation of precious metals
> or stones on the bank of the stream as well as his
> right to the alluvial soil itself. But not so,
> separate mineral estates such as oil and gas that
> are locked deep in the bowels of the earth, for they
> are separate fingers, parcels or estates in the land.
>
> I would also make it clear that severed mineral in-
> terests may never increase their interest by the
> process of accretion."

The Nilsen rationale which this Court is adopting was re-

jected by three other Oklahoma Justices in the later case of

Ellis v. Union Oil Company of Cal., 630 P. 306 (Oklahoma

1981). This later case involved other issues, but when it

referred to the Nilsen decision, three of the Justices could

not resist the opportunity to criticize it, as they should have.

It should also be pointed out that there is an unaddressed

issue in the case at bar that was not before the Oklahoma

Court in Nilsen. Montana has long recognized that while un-

extracted minerals are not taxable, the reservation of a right

to enter upon the surface to explore is a taxable interest. Hurley v. Northern Pacific Railway Co., 153 Mont. 199, 455 P.2d 321 (1969); Lehfeldt v. Adams, 130 Mont. 395, 303 P.2d 934 (1956); Cranston v. Musselshell County, 156 Mont. 288, 483 P.2d 289 (1971); Northern Pacific Ry. Co. v. Musselshell County, 54 Mont. 96, 169 P. 53 (1917). The Defendant, Burlington Northern, and its predecessors have paid such taxes on the property involved in this action. This Montana rule of a separate taxable entity seems to confirm the long held separate and distinct estate concept and, in my opinion, should have been considered by this Court.

Finally, the Nilsen rationale should be viewed in the light of a decision from a satellite cradle of Anglo-American law, the Queen's Bench Court of Alberta, Canada. A lake bed had dried up. Both the landowner and the Crown claimed ownership of the minerals beneath it. The owner's theory was that the dried up surface accreted to him under the common law doctrine, and that included the minerals. The Queen's Court agreed, but said:

> "If the Crown wished to retain its minerals while the lake was present it could have taken the separate title to those mines and minerals and disposed of them as it saw fit." Re Eliason and Northern Alta Land Registration District, 115 D.L.R. 3d 360, 6 W.W.R. 361 (Alberta Court of Queen's Bench, 1980)

In summary, I would reverse the trial Court, adopt the general common law doctrine of accretion, but except from that doctrine a previously severed mineral estate. The common law rule of accretion was never intended to apply to a severed mineral estate, and the majority opinion cites no authority to the contrary other than the questionable and criticized Nilsen.

The State's interests, real and fancied, should be subordinate to these severed and vested estates.

        Frank M. Davis, District Judge,
        sitting in place of
        Mr. Justice L. C. Gulbrandson

