Buel D. SWAIM and Sharon Ruth Swaim and David J. Kinney, Sr.
*v.* STEPHENS PRODUCTION COMPANY,
A Division of Stephens Group, Inc.

03-1385 196 S.W.3d 5

Supreme Court of Arkansas
Opinion delivered October 14, 2004

192

*Lonnie C. Turner*, and *Warner, Smith & Harris, PLC*, by: *P/K. Holmes, III*, for appellants.

*Daily & Woods, P.L.L.C.*, by: *Thomas A. Daily*, for appellee.

Annabelle Clinton Imber, Justice. Appellants Buel D. Swaim and Sharon Ruth Swaim and David J. Kinny, Sr., are successors-in-interest to Carrie Davidson and J.T. Harris who separately owned two real property tracts in Franklin County, both tracts being located adjacent to the Arkansas River.[1] Beginning in 1957, the owners of the Davidson tract entered into an oil, gas and mineral lease with Appellee Stephens Production Company, a division of Stephens Group, Inc. In 1964, Gulf Oil Corporation entered into an oil and gas lease with the State of Arkansas that encompassed a certain tract of land underlying the Arkansas River.[2] Likewise, in 1966, the owners of the Harris tract, which tract is located south of the Davidson tract, entered into an oil, gas and mineral lease with Stephens Production. The State lease and the Harris and Davidson leases were in customary form, reserving to the lessors a one-eighth (1/8th) royalty[3] in oil and gas produced under the leases. In addition, the Davidson and Harris leases included provisions stating that accretion land would be subject to the individual lease agreements.

In connection with the development and production of natural gas in Franklin County, Appellee Stephens Production, Gulf Oil and another company not involved in this appeal, Petroleum, Inc., executed a Declaration of Pooling and Unitization on March 17, 1967. Among other things, the pooling agreement enabled Stephens Production to proceed with the develop-

---

[1] Davidson owned the northern tract. Harris owned the southern tract. The Arkansas River abuts the eastern side of both tracts.

[2] The State of Arkansas holds title to the river bed underlying the Arkansas River. *Gill v. Porter*, 248 Ark. 140, 450 S.W.2d 306 (1970); *Owen v. Johnson*, 222 Ark. 872, 263 S.W.2d 480 (1954). This lease has been assigned. It is now owned by Stephens Production and Gulf Oil's successor, XTO Corporation.

[3] A "royalty" is the landowner's share of production, free of expenses of production and normally amounts to a one-eighth of eight-eighths interest. *Barrett v. Kuhn*, 264 Ark. 347, 572 S.W.2d 135 (1978) (citing Williams & Meyers, *Oil and Gas Terms* (4th ed. 1976)).

ment and production of natural gas located in the Davidson–Harris tracts and under the Arkansas River.

In 1990, Davidson and Harris amended their leases with Stephens Production to provide for a three-sixteenth (3/16th) royalty. The State Lease, however, remained fixed at the one-eighth (1/8th) royalty.

Meanwhile, over the course of many years of operation under the oil and gas leases, the Arkansas River shifted eastward in its course, causing accretion on the appellants' land. In January of 2000, the appellants, pursuant to Ark. Code Ann. § 22-5-405 (2004), obtained quitclaim deeds from the State of Arkansas covering the accreted land.

On August 24, 2001, the appellants filed a suit against Stephens Production for payment under the terms of the Davidson and Harris leases for their share of gas produced from the accreted acreage after confirmation of title by the State of Arkansas. Both parties moved for summary judgment. The trial court granted summary judgment in favor of Stephens Production, ruling that the State Lease providing for a one-eighth (1/8th) royalty remained effective for the accreted land. The appellants appealed to the Arkansas Court of Appeals. The case has been certified to us as an issue of first impression. Therefore, this court has jurisdiction under Rule 1-2(b)(1) of the Arkansas Rules of the Supreme Court.

We hold that the appellants, as riparian owners, are owners of the additional land formed by accretion, which ownership encompasses both the surface and mineral rights. Furthermore, because the lease agreements between Stephens Production and the appellants, i.e. the Harris and Davidson leases, by their express terms include any accretions, the accreted land is subject to the appellants' respective royalty interests granted under those leases. Thus, we conclude that the trial court erred in granting summary judgment in favor of Stephens Production. The trial court's summary-judgment order is hereby reversed and the case remanded for entry of summary judgment in favor of the appellants.

## I. Standard of Review

As noted above, the instant appeal arises out of a trial court's grant of summary judgment in favor of Stephens Production Company. In *Linn v. Nations Bank*, 341 Ark. 57, 14 S.W.3d 500 (2000), we set out the standard of review for a grant of summary judgment:

> The law is well settled that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998), *supp. opinion on denial of reh'g.*, March 5, 1998. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties.

*Id.* at 60-61, 14 S.W.3d at 503 (citing *Adams v. Arthur*, 333 Ark. 53, 62, 969 S.W.2d 598, 602 (1998)).

█ In this summary-judgment matter, there is no dispute as to any material fact. In cases where the parties agree on the facts, appellate courts simply determine whether the appellee was entitled to judgment as a matter of law. *Jackson v. City of Blytheville Civ. Serv. Comm'n*, 345 Ark. 56, 43 S.W.3d 748 (2001)(citing *Aloha Pool & Spas, Inc. v. Employer's Ins. of Wausau*, 342 Ark. 398, 39 S.W.3d 440 (2000), and *City of Little Rock v. Pfeifer*, 318 Ark. 679, 887 S.W.2d 296 (1994)).

█ This appeal also involves a matter of statutory interpretation. Issues of statutory interpretation are reviewed *de novo* because it is for this court to decide what a statute means. *City of Maumelle v. Jeffrey Sand Co*, 353 Ark. 686, 120 S.W.3d 55 (2003). While we are not bound to the trial court's ruling, we will accept the trial court's interpretation of a statute unless it is shown that the trial court erred. *R.N. v. J.M.*, 347 Ark. 203, 615 S.W.3d 149 (2001).

## II. The Doctrine of Accretion — Arkansas

█ Accretion is the "gradual deposit and addition of soil along the bank of a waterbody caused by the gradual shift of the waterbody away from the accreting bank." 8-A Williams & Meyers, *Oil and Gas Law* § 51 (2003). It is well settled in our case

law that when accretion land is formed by a gradual and imperceptible alteration in the land, the ownership of the land vests in the riparian owner "from whose shore or bank the water receded." *Warren v. Chambers*, 25 Ark. 120 (1867). Almost thirty years after *Warren v. Chambers, supra,* in the case of *Wallace v. Driver,* 61 Ark. 429, 33 S.W. 641 (1896), we explained that while the land contiguous to water may change ownership where the change is gradual and imperceptible, "the true test 'as to what is gradual and imperceptible in the sense of the rule is that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.' " *Wallace v. Driver,* 61 Ark. at 429, 33 S.W. at 642. As a general rule, the water itself is a natural boundary and contiguous landowner's rights change as the natural boundary lines change. *Wallace v. Driver, supra.*

This court has dealt with cases that are similar to the instant appeal. For example, in *Kansas City Fibre Box Co. v. Burkart Mfg. Co.,* 184 Ark. 704, 44 S.W.2d 325 (1931), the appeal involved a question regarding the ownership of property contiguous to the Arkansas River where timber was being cut. The timber had originally been located in the river bed. Over time, the river boundary changed paths, leaving the timber on accretion land. The court, after stating that the law concerning accretion is beyond dispute, held that the additional land formed by accretion belonged to the contiguous landowner. *Kansas City Fibre Box Co., supra.* (citing *Nix v. Pfeifer,* 73 Ark. 199, 83 S.W. 951 (1904)). More on point, perhaps, is the case of *Porter v. Arkansas Western Gas Co.,* 252 Ark. 958, 482 S.W.2d 598 (1972), where the gas company sought to have ownership determined for a gas well located on a piece of land near the Arkansas River. Although the appellants contended that the land was an island, the court concluded that the area was a non-navigable area and that title vested in the riparian owners. *Id.* While the facts in the *Porter* case and this case are not identical, this court has consistently held that additional land formed from the river's change in flow generally belongs to the riparian owners of the contiguous land. *See Wyatt v. Wycough,* 232 Ark. 760, 341 S.W.2d 18 (1960); *Desha v. Erwin,* 168 Ark. 555, 270 S.W. 965 (1925); *Yutterman v. Grier,* 112 Ark. 366, 166 S.W. 749 (1914).

■ The common law doctrine of accretion has also been codified by the Arkansas legislature with the enactment of Ark. Code. Ann. § 22-5-404 (2004), which statute acknowledges that title vests in riparian landowners when lands emerge by accretion from lakes or river beds. Specifically, section 22-5-404 states as follows:

> (a) The *title* to all lands which have formed or may form in the beds of nonnavigable lakes, or in abandoned river channels or beds, whether or not still navigable, which reformed lands or alluvia are above the ordinary high-water mark, *shall vest* in the riparian owners to the lands and shall be assessed and taxed as other lands.
>
> (b) The lands referred to in subsection (a) of this section shall include those lands which have emerged or which may emerge by *accretion*, reliction, evaporation, drainage, or otherwise from the beds of lakes or from former navigable streams, whether by natural or artificial causes, or whether or not the lakes were originally formed from the channel or course of navigable or nonnavigable streams.

Ark. Code Ann. § 22-5-404 (2004)(Emphasis added). Furthermore, section 22-5-405 provides in relevant part:

> (a) The Commissioner of State Lands is empowered and authorized to execute deeds to lands described in § 22-5-404 to riparian owners upon application and the filing of proof of record ownership of adjacent lands and proof of proper survey of the lands, conveying all the right, title, and interest of the State of Arkansas to lands as have emerged or may emerge to the mean high-water mark of any such stream or lake.

Ark. Code Ann. § 22-5-405 (2004).

■ According to the plain language of the statute, "title to all lands which have been formed . . . in the abandoned river channels or beds . . . shall vest in the riparian owners . . ." Ark. Code Ann. § 22-5-404(a). Thus, under that section, and under common law, title vests in the riparian landowner by virtue of the land emerging by accretion. The following section, Ark. Code Ann. § 22-5-405, which empowers the State Land Commissioner to execute deeds to riparian owners upon application, merely serves as a means to confirm title in the adjacent riparian owner of

accretions to his or her property. *River Land Co., Inc. v. McAlexander,* 10 Ark. App. 123, 661 S.W.2d 451 (1983); *Gill v. Porter,* 248 Ark. 140, 450 S.W.2d 306 (1970) (statutes at issue designed to furnish a means by which the State can acknowledge the abandonment of a river bed).

Although Stephens Production admits that the appellants obtained quitclaim deeds from the State of Arkansas pursuant to Section 22-5-404, it nonetheless cites the case of *Hillard v. Stephens,* 276 Ark. 545, 637 S.W.2d 581 (1982), for the proposition that oil and gas leases should have special legal recognition due to the fact that oil and gas leases are "more than conveyances of determinable interests in the oil and gas below the lands which they cover." Furthermore, Stephens Production contends that, due to the express terms of the State lease, that lease continues to run with the land because the lease provisions state "any conveyance of any interest in said production and/or royalties hereafter made while this lease is in full force and effect shall be made subject to this agreement."

Stephens Productions' reliance on *Hillard v. Stephens, supra,* is misplaced. In that case, we merely construed certain provisions contained in the respective oil and gas leases. *Hillard* is certainly not authority for the proposition that an oil and gas lessee continues to hold mineral lease rights in the land where due to accretion title becomes vested in a subsequent riparian landowner. Likewise, the express provisions of the State's lease fail to support the assertion by Stephens Production that the State lease continues to run with the accreted land. Unlike a conveyance where a grantor transfers title to a grantee, when land accretes, ownership of the land vests automatically in the riparian landowner both under the common law doctrine of accretion and Section 22-5-404. As explained earlier, the issuance of a quitclaim deed by the State of Arkansas is merely confirmation of title. *River Land Co., Inc. v. McAlexander, supra; Gill v. Porter, supra.* As the accreted land was not transferred by conveyance and it is no longer acreage contributed by the State to the drilling unit, the State lease no longer applies to the accretion lands.

*III. Doctrine of Accretion and Mineral Rights — Other Jurisdictions*

Other jurisdictions have concluded that mineral interests in land are subject to the doctrine of accretion. For example, in *Ely v. Briley,* 959 S.W.2d 723 (Tex. App.–Austin

1998), where landowners filed suit against an oil and gas lessee claiming mineral royalties from the accreted property, the Texas Court of Appeals decided that a mineral interest is a property interest irrespective of whether or not the mineral interest is constructively severed from the land. "Because a constructively severed mineral estate is a property interest of equal dignity as a surface estate, it logically should be subject to accretion." *Id.* at 726. Likewise, another division of the Texas Court of Appeals recently adopted the same approach. *Siegert v. Seneca Resources Corp.*, 28 S.W.3d 680 (Tex. App.–Corpus Christi 2000).

█ In *Nilsen v. Tenneco Oil Co.*, 614 P.2d 36 (Okla. 1980), the Oklahoma Supreme Court was asked to decide whether accretion carries with it title to the underlying minerals, when the minerals have been severed from the surface estate. The trial court had ruled that a severed mineral interest could not be lost by accretion. The Oklahoma Supreme Court disagreed based upon its view that distinguishing between severed and unsevered mineral interests would allow fee owners to convey a greater mineral estate than they themselves possess. *Id.* The court also noted that such a rule would inevitably result in inequities because an unsevered mineral interest would still be subject to loss by virtue of accretion; whereas, a severed mineral interest would never be subject to such loss. *Id.* The Supreme Court of Montana adopted the *Nilsen* court's analysis, holding that severed mineral interests are subject to the doctrine of accretion. *Jackson v. Burlington Northern, Inc.*, 205 Mont. 200, 207, 667 P.2d 406, 409-410 (1983). Finally, various treatises on oil and gas law agree that the majority of courts are consistent in holding that mineral rights are subject to the doctrine of accretion. 1-2 William & Meyers, *Oil and Gas Law* § 224. 9 (2003); Eugene Kuntz, *Law of Oil and Gas* § 3.2(c) (2003).

██ Stephens Production nonetheless suggests that the above-cited cases are inapposite because the appeal here does not concern the distinction between severed and unsevered mineral rights. While we agree that such a distinction is not at issue here, other jurisdictions have not extended additional protection for a "working interest" under an oil and gas lease.[4] In fact, the Texas Court of Appeals has acknowledged that an unsevered

---

[4] The "working interest" is the operating interest under an oil and gas lease. *Barrett v. Kuhn*, 264 Ark. 347, 572 S.W.2d 135 (1978) (citing Williams &Meyers, *Oil and Gas Terms* (4th

riparian mineral estate is subject to the doctrine of accretion. *Ely v. Briley, supra.* Similarly, the Oklahoma Supreme Court in *Ellis v. Union Oil Co. of California,* 630 P.2d 306 (Okla. 1981), noted that *Nilsen* stood for the proposition that "mineral estates, whether severed or not, are like surface estates, both subject to loss or gain by the process of accretion." *Id.* at 309. *See also, Seigle v. Thomas,* 627 P.2d 417 (Okla. 1981). Here, it is undisputed that the appellants own both the surface and mineral estates; that is, the mineral interests at issue are unsevered and therefore subject to the doctrine of accretion. Even those commentators who are critical of court decisions holding that severed minerals estates are subject to accretion unanimously agree that unsevered mineral estates should be subject to accretion. Daniel K. Brough, *Alternatives In Accretions: Why There Is Not Yet An Appropriate Solution To The Application of Accretion Law to Mineral Estates,* 2004 B.Y.U. L. Rev. 169 (2004); Robert K. Kimball, *Accretion and Severed Mineral Estates,* 53 U. Chi. L. Rev. 232 (1986).

 Notwithstanding the previously noted authority to the contrary, Stephens Production asserts that we should treat a "leasehold working interest" in a production unit differently by recognizing an oil and gas lease exception to our doctrine of accretion. As defined by Stephens Production, a leasehold working interest is automatically acquired by a lessee under an oil and gas lease, without regard to whether the mineral interest is severed or not.[5] Although Stephens Production may indeed have a working interest under the oil and gas leases, neither party has cited us to any authority that supports an exemption from the doctrine of accretion for a leasehold working interest. This court will not consider an argument without citation to authority, unless the argument is so well-established that no additional research is necessary. *Kelly v. State,* 350 Ark. 238, 85 S.W.3d 893 (2002); *Rainey v. Hartness,* 339 Ark. 293, 5 S.W.3d 410 (1999).

---

ed. 1976)). An oil and gas lease grants to the lessee the right to drill and produce oil and gas, subject to a duty to pay royalty upon that production. *Osborn v. Arkansas Territorial Oil & Gas Co.,* 103 Ark. 175, 146 S.W. 122 (1912). No title passes until the oil and gas is reduced to possession. *Pasteur v. Niswanger,* 226 Ark. 486, 290 S.W.2d 852 (1956); *Osborn v. Arkansas Territorial Oil & Gas Co., supra.*

[5] The object of a leasehold estate working interest is to produce the mineral sought. *Pasteur v. Niswanger, supra.*

■ Similarly, Stephens Productions also contends that the unique nature of leasehold working interests should override "some technical interpretation of when and how title vests when riverbed lands emerge and become dry land." In other words, Stephens Production urges this court to ignore the common law doctrine of accretion and the Arkansas legislature's acknowledgment of that doctrine by the enactment of Section 22-5-404. Once again, we decline to consider an argument without citation to authority.

■ Finally, the terms of the Davidson and Harris leases expressly acknowledge the common law doctrine of accretion. The oil and gas leases between Stephens Production and the appellants provide that the leases extend to any accretions.[6] Thus, we hold that the accreted land is subject to the appellants' respective royalty interests granted under those leases.

Reversed and Remanded.

THORNTON, J., not participating.

---

[6] From the Davidson Lease:

"Lessor ... hereby grants, leases, and lets exclusively unto Lessee ... the following described land in Franklin County, State of Arkansas, ... It is intended to convey all that part of above fractional quarter section West of the Arkansas River, together *with all accretions* and riparian rights thereto belonging." (Emphasis added)

From the Harris Lease:

"Lessor ... hereby grants, leases, and lets exclusively unto Lessee ... the following described land in Franklin County, State of Arkansas, ... containing 114 acres, more or less, including *any accretions* hereto or hereafter formed." (Emphasis added)